RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0182p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

TIMMY L. FIELDS,

*Defendant-Appellant*.

No. 20-5521

Appeal from the United States District Court for the Eastern District of Kentucky at London.
No. 6:19-cr-00029-1—Robert E. Wier, District Judge.

Argued: June 23, 2021

Decided and Filed: August 10, 2022

Before: ROGERS, WHITE, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Michael J. Stengel, MICHAEL J. STENGEL, PC, Memphis, Tennessee, for Appellant. Andrew C. Noll, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Michael J. Stengel, MICHAEL J. STENGEL, PC, Memphis, Tennessee, for Appellant. Andrew C. Noll, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., Jenna E. Reed, R. Nicholas Rabold, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

WHITE, J., delivered the opinion of the court in which MURPHY, J., joined, and ROGERS, J., joined in part. MURPHY, J. (pp. 35–46), delivered a separate concurring opinion in which WHITE, J., joined except as to Part II.A. ROGERS, J. (pp. 47–49), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

HELENE N. WHITE, Circuit Judge.  Defendant Timmy Fields appeals his twenty-five-year mandatory-minimum sentence enhancement imposed for his having committed two prior "serious drug felon[ies]."  Fields challenges the procedure used to impose his enhancement and argues as well that neither prior conviction was for a "serious drug felony."  Most of Field's challenges lack merit, but we agree that one of the predicate prior convictions was not for a "serious drug felony."  Accordingly, we VACATE Fields's sentence and REMAND for resentencing.

## I. BACKGROUND

In January 2020, a jury convicted Defendant Timmy Fields of possessing 500 grams or more of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).  The district court imposed a statutory sentence enhancement under 21 U.S.C. § 841(b)(1)(A)(viii), finding that Fields had convictions for two previous "serious drug felon[ies]" in Kentucky—one for possessing a methamphetamine "precursor" with intent to manufacture, the other for trafficking in methamphetamine.  Fields raises several challenges to the procedure used to impose the enhancement and the characterization of his prior offenses as "serious drug felonies."

### A.  Relevant Statutory and Legal Background

Section 841(b)(1)(A) provides for a twenty-five-year-minimum sentence enhancement if a defendant commits certain violations of 21 U.S.C. § 841(a) "after 2 or more prior convictions for a serious drug felony . . . have become final[.]"  Prior to the First Step Act, this enhancement provided for a mandatory life sentence after two prior final convictions for a "felony drug offense," which included certain drug-related state or federal offenses punishable by more than a year of imprisonment.  21 U.S.C. § 802(44); First Step Act of 2018, Pub. L. No. 115-391, § 401(a)(2)(A)(ii), 132 Stat. 5194, 5220.  The First Step Act lowered this mandatory minimum to twenty-five years and replaced "felony drug offense" with a new term, "serious drug felony."  First Step Act § 401(a)(1), (a)(2)(A)(ii).  Relevant here, a "serious drug felony" is (1) a "serious

drug offense" under 18 U.S.C. § 924(e)(2)(A), for which the defendant (2) served over a year in prison and (3) was released within fifteen years of the commencement of the instant offense. 21 U.S.C. § 802(57).[1]

A "serious drug offense," as relevant here, means a state-law offense "involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in [21 U.S.C. § 802]), for which a maximum term of imprisonment of ten years or more is prescribed by law."  18 U.S.C. § 924(e)(2)(A)(ii).  So, in this case, prosecutors had to show two prior final convictions for "serious drug offenses" and prove that for each, Fields served over a year in prison and was released within 15 years of the commencement of the instant offense.

Another statutory provision, 21 U.S.C. § 851, governs the procedure for imposing conviction-based statutory sentence enhancements under § 841.  Section 851(a) requires the government to file an "information" (often referred to as the "§ 851 notice") informing the defendant of its intent to seek an enhancement based on prior convictions, "stating in writing the previous convictions to be relied upon."  21 U.S.C. § 851(a)(1).  Section 851(b) provides that the court—after conviction but before pronouncing a sentence—must ask the defendant if he affirms or denies that he was previously convicted as alleged in the § 851 notice.  *Id.* § 851(b).  The court must also "inform [the defendant] that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence."  *Id.*

Section 851(c) provides that if the defendant "denies any allegation" in the § 851 notice or claims that any conviction is invalid, the defendant "shall file a written response[.]"  *Id.* § 851(c)(1).  Then, "[t]he court shall hold a hearing to determine any issues raised by the response which would except the person from increased punishment."  *Id.*  This "hearing shall be before the court without a jury[.]"  *Id.*  "[E]ither party may introduce evidence," and aside from an exception for claims that a prior conviction was obtained in violation of the Constitution, the

---

[1]A "serious drug felony" can also be a "violent felony" as described in 18 U.S.C. § 924(e)(2)(B), but that definition is not relevant to this case.  *See* 21 U.S.C. § 802(57) (defining "serious drug felony" as "an offense described in section 924(e)(2) of Title 18 for which" the defendant served over a year in prison and was released within fifteen years of present offense); 18 U.S.C. § 924(e)(2) (providing definitions for "serious drug offense" and "violent felony").

government "shall have the burden of proof beyond a reasonable doubt on any issue of fact. At the request of either party, the court shall enter findings of fact and conclusions of law." *Id.* § 851(c)(1)-(2).

The Sixth Amendment requires that juries determine any facts (except the fact of a conviction) that increase a statutory maximum or mandatory-minimum punishment. *Alleyne v. United States*, 570 U.S. 99, 103, 111 n.1 (2013); *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Fields argues *Alleyne* requires that the First Step Act's incarceration facts—"the offender served a term of imprisonment of more than 12 months [for the prior offense]" and "the offender's release from any term of imprisonment was within 15 years of the commencement of the instant offense," § 802(57)—must go to a jury under *Alleyne* but that § 851 requires a judge to decide them, creating an unsolvable problem.

## B. Factual Background

In April 2019, Kentucky police pulled Fields over and discovered 985 grams of methamphetamine in his vehicle. A few months later, a federal grand jury indicted Fields with one count of possession of 500 grams or more of methamphetamine with intent to distribute, in violation of 21 U.S.C § 841(a)(1). The indictment also alleged that Fields had two prior "final conviction[s] for . . . serious drug felon[ies]" for which he served over a year in prison and was released within fifteen years of the instant offense. R. 1 PID 1-2. The first was for "Trafficking in a Controlled Substance in the First Degree," in violation of Ky. Rev. Stat. § 218A.1412 (the Trafficking Offense). *Id.* PID 1. The second was for "Unlawful Possession of a Methamphetamine Precursor and Persistent Felony Offender," in violation of Ky. Rev. Stat. §§ 218A.1437 & 532.080 (the Meth-Precursor Offense). *Id.* PID 1-2.

Before trial, the government filed a § 851 notice, stating its intent to seek a sentence enhancement based on these two prior convictions. The government also filed a pretrial motion—which Fields did not oppose at the time—to bifurcate the trial into two phases. In the first phase, the government would seek to prove the substantive § 841 drug offense. If Fields were found guilty, the trial would move to a second phase, where the government would seek to

prove that Fields had previously been convicted of two serious drug felonies.  The court granted the unopposed motion.

### 1.  The Trial

The final pretrial conference took place on January 14, 2020, the day before trial.  It largely focused on what prior-conviction facts, if any, should go to the jury if the second phase was reached.  The district court and government took the position that the Sixth Amendment required the incarceration-related facts (length of incarceration and recency of release) to be decided by the jury.  But counsel for Fields argued that "none of it is a jury question," raising the same argument noted above: that under Supreme Court precedent, the additional incarceration-related facts had to be found by a jury, but that § 851 required the court to find them.  R. 111 PID 794.  Thus, counsel argued, if Fields were convicted, he should "[j]ust be subject to the penalty without any enhancement for prior convictions."  *Id.* PID 797.

Trial began the next day.  The government put on all its guilt-phase proofs on day one.  At the end of the first day, the parties conferred with the court to discuss the § 851 issue further.  The court said that if a second phase was necessary, it would likely ask the jury to find whether Fields was convicted of each prior offense and determine, for each, whether he served over a year in prison and was released within fifteen years of his current offense.  Counsel for Fields repeated his objection, to which the court responded that the Sixth Amendment, not § 851, determines what questions go to the jury.[2]  The court added that its approach may leave Fields

---

[2]Mr. Hoskins:  Your Honor, I think that as the law stands now, that the only statutory way to address these points is for the Court to make the determination on the prior convictions.  And the arguments that I made earlier, I think there is a problem with a federal contradiction between the First Step Act and 851 as written. . . .

The Court:  You gave me a thoughtful argument, and I appreciate the argument.  But what defines what goes to a jury is the Sixth Amendment, not a statute.  And if the enhancing facts are within the ambit of the Sixth Amendment, that tells me it has to go to the jury.  I don't need a statute to tell me that.  The constitution is the primary authority, not the statute. . . .  I understand your argument about 851, but I don't think that defines what goes to the jury.  I think the Court has to define the elements of the crime.  The elements of the crime go to the jury under the Sixth Amendment. . . . [T]o the extent there is a Sixth Amendment issue, it is easily cured by letting the jury decide.  That's what I intend to do.

R. 107 PID 525-28.

with a statutory argument but would likely prevent him from raising a subsequent Sixth Amendment challenge on appeal:

> The Court: Well, you know, I understand strategically your argument. I do want to make it clear that I'm extending to the defendant kind of the option of having what I think is the most robust Sixth Amendment protection he can have, and that is for the jury to decide all of it. Down the road, if he's convicted and the jury finds what it finds, if he's got an argument to make, it is going to be that the statutory authority, or clash, as you pointed out, somehow deprives the Court of the power to honor the Sixth Amendment in the way that I'm proposing. It is not going to be there was a violation of the Sixth Amendment by the Court making a finding that the jury could make, because I'm giving him the chance to have it all decided by the jury. Just to make that clear.

> Mr. Hoskins: We recognize that, Your Honor.

R. 107 PID 557-58.

On the second day of trial, the jury deliberated and returned a guilty verdict on the substantive § 841 offense. During deliberations, the court again recognized that Fields "ha[s] an overall objection" to the second-phase jury instructions. R. 108 PID 564. Fields's counsel noted that other than the general objection regarding the appropriate factfinder, "Fields is not going to contest that those two Laurel Circuit Court convictions are him." *Id.* Fields, his lawyer, and government counsel then submitted a stipulation that Fields was convicted of the Meth-Precursor Offense on December 27, 2006 and was convicted of the Trafficking Offense on January 24, 2013. The district court then engaged in the mandated § 851(b) colloquy with Fields, asking him whether he affirmed or denied that he was convicted of these two previous offenses. Fields affirmed that he was.

A brief second phase then began, with the government presenting proof that for both prior convictions, Fields served more than a year in prison and was released within fifteen years from the date of his current offense. Before the jury deliberated, at the close of evidence, Fields's lawyer made an oral motion for judgment of acquittal, arguing that neither prior offense met the legal definition of "serious drug offense." The court denied the motion but noted that Fields had preserved the issue and could develop his arguments prior to sentencing. In a special verdict form, the jury found both factual predicates were satisfied for each prior conviction.

**2. Sentencing**

After trial had concluded and before sentencing, Fields filed an "Objection to § 851 Notice" and an objection to his pre-sentence report, both focusing exclusively on whether his prior offenses were "serious drug offenses," and neither raising any factual disputes regarding the length or recency of his incarceration for the two prior convictions. Regarding the Meth-Precursor Offense, he argued that *Shular v. United States*, 140 S. Ct. 779 (2020), required the court to ask whether the offense "necessarily entail[ed]" any of the conduct described in § 924(e)(2)(A)(ii) and contended that it did not. He also argued that the Trafficking Offense was overly broad because it could encompass trafficking in certain substances that were excluded from federal controlled-substance schedules, including inhalers with levmetamfetamine.

During argument, Fields's counsel emphasized that it was possible to violate the meth-precursor statute before ever beginning the manufacturing process and that the offense did not necessarily entail the predicate conduct. The government responded that the statute's requirement that the defendant possess a methamphetamine ingredient with *intent* to manufacture means that it necessarily entails manufacturing. The district court expressed some skepticism, *see* R. 109 PID 653 ("[C]an you call something that involves intent to use a chemical as a precursor to manufacturing part of manufacturing? Is that logical?"), and posed a hypothetical to test the theory:

> The Court: So if somebody is in a drugstore and shoplifts a pack of Sudafed with the intent to take it to a cook, the second that shoplifting occurs, you would consider that manufacturing?
>
> [AUSA] Mr. Rabold: Not necessarily. I mean, that's possession of a precursor, but it requires that there is the intent to use it as a precursor of methamphetamine. And that's just - -
>
> The Court: That's what I said.
>
> Mr. Rabold: Yes.
>
> The Court: So in that context, that person is guilty of an offense involving manufacturing?
>
> Mr. Rabold: I would say so, just based on the plain reading of KRS 218A.1437. That if they possessed that precursor with the intent of using it as a precursor to manufacturing methamphetamine, then that person would then be guilty of that offense.

*Id*. PID 653-54.  The court ultimately sided with the government, reasoning that our decision in *United States v. Eason*, 919 F.3d 385 (6th Cir. 2019), which found a similar Tennessee conviction to be a serious drug offense, "decides the issue."  *Id*. PID 665.  The court noted that *Shular* may arguably "shrink[]" *Eason*'s analysis, as the latter relied on a "[p]retty broad reading" of § 924(e)(2)(A)(ii) asking only if the prior crime "related to and connected with manufacturing," but concluded that "*Eason* is a published Sixth Circuit case that I feel bound by."  *Id.* PID 665-66.

Applying the statutory enhancement, the district court sentenced Fields to 300 months in prison (the bottom of the mandatory range), noting that "[w]ithout that mandatory minimum," it would have imposed a lower sentence.  *Id.* PID 710.  The district court also issued two written orders explaining its reasoning on the § 851 issue and "serious drug offense" issues, respectively.  Fields timely appealed.

## II.  STANDARD OF REVIEW

Fields raises several legal challenges to his sentencing enhancement, some for the first time on appeal.  We review the ones raised below de novo.  *See United States v. Mateen*, 764 F.3d 627, 630 (6th Cir. 2014) (en banc) (per curiam); *United States v. Green*, 654 F.3d 637, 649 (6th Cir. 2011); *Eason*, 919 F.3d at 388.  But we apply plain-error review to arguments first raised on appeal, *United States v. Cavazos*, 950 F.3d 329, 334 (6th Cir. 2020), requiring (1) an error; that (2) was "plain" (i.e., obvious or clear); (3) affected the defendant's substantial rights; and (4) affected the fairness, integrity, or public reputation of the judicial proceedings.  *Id.*  We first address Fields's challenges to the district court's § 851 procedure.  We then address whether his prior convictions were "serious drug offenses."

## III.  CHALLENGES TO § 851 PROCEDURE

Fields raises four challenges to the procedure used to impose his enhancement.  He first argues that § 851(b) facially violates the Fifth Amendment by compelling defendants to testify regarding previous convictions; second, that § 851(c) facially violates the Sixth Amendment by requiring judges to determine facts—the length and recency of incarceration—that the Constitution requires to be decided by a jury; third, that the court violated § 851 by sending those

facts to the jury here; and finally, that the court violated the Sixth Amendment by not requiring the jury to decide whether his prior convictions were "final."  We take these arguments in order.

## A.  The Fifth Amendment Challenge

Fields first argues that § 851(b) violates a defendant's Fifth Amendment right against self-incrimination by requiring that courts ask defendants to "affirm or deny" prior convictions and warn defendants that they may forfeit challenges they do not raise prior to imposition of sentence.  Fields Br. at 17-18.  He did not raise this argument below, so plain-error review applies.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself[.]"  U.S. CONST. amend. V.  But this privilege "is not a self-executing mechanism; it can be affirmatively waived, or lost by not asserting it in a timely fashion."  *Maness v. Meyers*, 419 U.S. 449, 466 (1975).  Generally, answers "are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of the privilege."  *Minnesota v. Murphy*, 465 U.S. 420, 427 (1984).  The Fifth Amendment "speaks of compulsion.  It does not preclude a witness from testifying voluntarily in matters which may incriminate him.  If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment."  *Id.* (quoting *United States v. Monia*, 317 U.S. 424, 427 (1943)).

Fields never asserted the privilege.  Despite being informed of the right not to testify, Fields did not invoke that right when asked if he affirmed or denied his prior convictions. Indeed, prior to being asked that question, he voluntarily stipulated that he had been convicted of those offenses.  Fields thus did not suffer a Fifth Amendment violation, and his challenge fails. *See Garner v. United States*, 424 U.S. 648, 653 (1976) ("[A] witness who reveal[s] information instead of claiming the privilege los[es] the benefit of the privilege."); *see also United States v. Jones*, 447 F. App'x 319, 326 (3d Cir. 2011) (rejecting "Jones's facial challenge to 21 U.S.C. § 851(b) under the Fifth Amendment" because "as applied," there was no constitutional violation).

**B. The Sixth Amendment Challenge**

Fields next argues that § 851(c) is facially unconstitutional under the Sixth Amendment because it requires the judge to decide facts—the length and recency of incarceration—that should be decided by the jury.

In general, the Sixth Amendment requires the jury to decide any fact that increases the statutory maximum or mandatory-minimum sentence available for a crime. *Alleyne*, 570 U.S. at 103; *Apprendi*, 530 U.S. at 490. But there is an exception to this rule for the "fact of conviction." This exception stems from *Almendarez-Torres v. United States*, 523 U.S. 224, 226-27 (1998). The Court has described *Almendarez-Torres* as an "exceptional departure from" and "narrow exception to the general rule." *Apprendi*, 530 U.S. at 487, 490; *see also Alleyne*, 570 U.S. at 111 n.1 ("In *Almendarez-Torres*[], we recognized a narrow exception to this general rule for the fact of a prior conviction."); *United States v. Haymond*, 139 S. Ct. 2369, 2377 n.3 (2019) (plurality) (stating that *Almendarez-Torres* provides a "narrow exception[] to *Apprendi*'s general rule").

Here, the district court held—and the parties seem to assume—that the Sixth Amendment would require the jury to decide whether, for each prior conviction, Fields was incarcerated for over a year and released within fifteen years of the instant offense. The basis for the district court's view is intuitive. *Alleyne* and *Apprendi* described the *Almendarez-Torres* exception as "narrow" and applying only to the fact of conviction, and the First Step Act's incarceration facts extend beyond the fact of conviction. Further, in justifying the *Almendarez-Torres* exception, the Court has explained that prior convictions are "constitutional[ly] distinct[]" because "unlike virtually any other consideration used to enlarge the possible penalty for an offense, . . . a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt, and jury trial guarantees." *Jones v. United States*, 526 U.S. 227, 249 (1999). That rationale does not apply to post-conviction facts regarding time served or recency of release. These are *new* facts never previously found in a proceeding with built-in constitutional protections.

But the Court has also sometimes used a broader justification for the *Almendarez-Torres* exception that cuts the other way.  The Court has justified the exception on the basis that, traditionally, facts involving recidivism have been within the province of judicial fact-finding and that these facts are usually unconnected with the substantive offense at issue.  *See Almendarez-Torres*, 523 U.S. at 243 (noting that "the sentencing factor at issue here— recidivism—is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence"); *Jones*, 526 U.S. at 235, 248-49 (making similar point); *Apprendi*, 530 U.S. at 488 (pointing out that *Almendarez-Torres* emphasized "the fact that recidivism 'does not relate to the commission of the offense'" (quoting *Almendarez-Torres*, 523 U.S. at 244)).  If *Almendarez-Torres* creates an exception more broadly for "recidivism," there is a case for saying that the incarceration-related facts are a good fit for the exception.  They arguably relate only to recidivism, and they are completely unconnected to the current offense.

Two district court decisions directly addressing the Sixth Amendment implications of the new "serious drug felony" incarceration facts have reached opposite conclusions.  The difference in their reasoning tracks the separate rationales described above.  The district court in our case held that the jury must decide these facts, emphasizing the Court's clear statements that the *Almendarez-Torres* exception is "narrow" and limited solely to the "fact of conviction."  *See United States v. Fields*, 435 F. Supp. 3d 761, 764 (E.D. Ky. 2020) (stating that these facts amount to "empirical issues, which rise or fall based on events occurring only after the conviction," and thus "by definition are beyond the 'fact' of conviction (the narrow *Almendarez-Torres* harbor)"); *see also United States v. Beal*, No. 18-00070, 2021 WL 4524159, at *3 n.6 (D. Haw. Oct. 4, 2021) (stating "that the more 'conservative approach' would be to put the question of the serious drug felony determination to the jury before its dismissal").  But a North Carolina district court recently held the opposite, relying more heavily on the "recidivism" justification.  *See United States v. Lee*, 2021 WL 640028, at *3-7 (E.D.N.C. Feb. 18, 2021) ("The exception for the fact of a prior conviction is based in the recognition that recidivism does not relate to the commission of the offense." (internal quotation marks omitted)); *see also United States v. Fitch*, No. 19-CR-30, 2022 WL 1165000, at *2 (N.D. Ind. Apr. 19, 2022) (concluding that, although the First Step Act added new facts to consider, those facts are still facts of a prior conviction).

Though both *Fields* and *Lee* give the issue thoughtful consideration, the district court's view in our case appears more persuasive. Although one can find strands of reasoning supporting a broader reading of *Almendarez-Torres*, the Court's repeated descriptions of *Almendarez-Torres* as "narrow" and limited to the "fact of conviction" cut against this approach. But ultimately, we need not (and do not) definitively decide this constitutional issue because even assuming that the incarceration-related facts must be decided by a jury, there was no constitutional violation here.

The basis of Fields's constitutional argument is that § 851(c) requires the judge to decide factual questions (length and recency of incarceration) that must go to the jury under *Alleyne*. But those facts were actually submitted to the jury here. Fields therefore suffered no personal constitutional violation. Instead, his argument is based on a counterfactual hypothetical: he argues that under the correct reading of § 851, the judge *should have* decided these facts himself, and that *had he done so*, he would have violated the Sixth Amendment. That, however, did not happen here. Although Fields has a potential *statutory* argument—that the court did not follow § 851—the district court's application of § 851 did not produce a Sixth Amendment violation.

Fields's facial challenge also fails. Facial challenges only succeed if the challenger can show "that no set of circumstances exists under which the [challenged statutory provision] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Fields cannot do so. Section 851 applies to all conviction-related enhancements imposed on those convicted of an offense under 21 U.S.C. §§ 841-65, *see id.* § 851(a)(1), and several of those enhancements do not turn on the type of incarceration-related facts that, according to Fields, implicate the Sixth Amendment. *See, e.g.*, *id.* § 841(b)(1)(C) (enhancement for "felony drug offense," which 21 U.S.C. § 802(44) defines without reference to incarceration-related facts); *see also id.* § 842(c)(2)(B); *id.* § 843(d)(1). Fields has not shown that § 851 would be unconstitutional as applied to these types of enhancements.[3] In short, Fields's facial challenge lacks merit. So does any personal "as-

---

[3]Even in the "serious drug felony" context, § 851 would not be unconstitutional in all its applications. Section 851(c)(1) provides that a court "shall hold a hearing to determine any issues *raised by*" a defendant. 21 U.S.C. § 851(c)(1) (emphasis added). If a defendant concedes the length and recency of incarceration but raises the purely legal challenge that his prior convictions were not for "serious drug offenses," there would be no Sixth Amendment issue, even under Fields's view.

applied" challenge (to the extent he brings one), because the jury decided the facts Fields said it needed to decide.

## C. The § 851 Statutory Challenge

The closer question is whether the district court failed to follow § 851. "The requirements delineated in § 851 are mandatory, and a district court cannot enhance a defendant's sentence based on a prior conviction unless" they are satisfied. *United States v. King*, 127 F.3d 483, 487 (6th Cir. 1997); *see also Carachuri-Rosendo v. Holder*, 560 U.S. 563, 569 n.6 (2010) ("Although § 851's procedural safeguards are not constitutionally compelled, they are nevertheless a mandatory feature of the Controlled Substances Act." (citation omitted)); *United States v. LaBonte*, 520 U.S. 751, 754 n.1 (1997) ("[I]mposition of an enhanced penalty is not automatic. . . . If the Government does not file [a] notice [under § 851(a)(1)] . . . the lower sentencing range will be applied even though the defendant may otherwise be eligible for the increased penalty.").

The question is whether § 851 *required* the district court to decide the incarceration-related facts here—i.e., whether it *precluded* the district court from sending those factual questions to the jury in the post-guilt phase of the bifurcated trial proceeding. Before addressing the parties' arguments on that question, we briefly review § 851's statutory scheme.

**1.**

As relevant here, § 851(a)(1) provides that "[n]o person who stands convicted of an offense under this part [21 U.S.C. §§ 841-65] shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty," the government "files an information with the court" and serves a copy on the defendant "stating in writing the previous convictions to be relied upon." 21 U.S.C. § 851(a)(1). Section 851(b) provides that when such an information is filed, "the court shall after conviction but before pronouncement of sentence" ask the defendant "whether he affirms or denies that he has been previously convicted as alleged in the information, and shall inform him that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence." *Id.* § 851(b).

Section 851(c) provides that if the defendant "denies any allegation of the information of prior conviction, or claims that any conviction alleged is invalid, he shall file a written response to the information" and serve the government with a copy. *Id.* § 851(c)(1). Then, "[t]he court shall hold a hearing to determine any issues raised by the response which would except the person from increased punishment." *Id.* "The hearing shall be before the court without a jury and either party may introduce evidence." *Id.* Aside from one exception (when the defendant asserts that the prior conviction was obtained in violation of the Constitution), the government "shall have the burden of proof beyond a reasonable doubt on any issue of fact." *Id.* § 851(c)(1)-(2). The "failure of the [government] to include in the information . . . any facts in addition to the convictions to be relied upon shall not constitute grounds for invalidating the notice[.]" *Id.* § 851(c)(1). "At the request of either party, the court shall enter findings of fact and conclusions of law." *Id.*

Section 851(d)(1) provides that the court "shall proceed to impose sentence" upon the defendant if the defendant fails to respond to the § 851 notice "or if the court determines, after hearing, that the person is subject to increased punishment by reason of prior convictions[.]" *Id.* § 851(d)(1). Section 851(d)(2) provides that the court must—if requested by the government— stay imposition of the sentence to allow for appeal if the court "determines that the person has not been convicted as alleged in the information, that a conviction alleged in the information is invalid, or that the person is otherwise not subject to an increased sentence as a matter of law[.]" *Id.* § 851(d)(2). Finally, § 851(e) prevents defendants from "challeng[ing] the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction." *Id.* § 851(e).

**2.**

The parties first dispute whether § 851 applies to the incarceration-related facts at all. The government argues that § 851's text is limited to questions involving the validity of previous convictions and "does not encompass the resolution of any term-of-imprisonment-related questions at all." Gov't Br. at 18. In support of this argument, it cites portions of § 851(a)(1),

(b), and (d)(2) that refer to challenges implicating the validity of convictions, as well as § 851's title ("[p]roceedings to establish prior convictions.").**4**  We are not persuaded.

The government picks out portions of § 851 that mention the validity of convictions but omits parts of the statute using broader language, in particular § 851(c)(1), the main sub-section Fields relies on.  Section 851(c)(1) provides that "[i]f the person denies *any allegation* of the information of prior conviction," he must file a written response.  21 U.S.C. § 851(c)(1) (emphasis added).  "Any allegation" is broad.  The subsection adds that the court "shall hold a hearing to determine *any issues raised by the response* which would except the person from increased punishment."  *Id.*  (emphasis added).  Had Congress sought to limit § 851 to challenges involving the validity or existence of convictions, it could have said so here.  "[A]ny issues" is far broader.  *See, e.g.*, *id.* (stating that the government will have the burden of proof on "*any issue* of fact" in the § 851(c) hearing (emphasis added)).  Section 851(c)(1) also expressly contemplates that the hearing may encompass facts beyond the mere fact of conviction.  It states that the government's "failure" to "include . . . *any facts in addition to the convictions to be relied upon*" will not invalidate the § 851 notice.  *Id.* (emphasis added).  If the § 851 hearing is focused only on the existence of a conviction, why reference "facts in addition to the conviction"?  *See, e.g.*, *Lee*, 2021 WL 640028 at *5 (citing these portions of § 851 and concluding that its scope "encompasses a variety of subsidiary findings necessary to define or qualify [a] prior conviction").

Section 851(c)(1) refers to a "hearing to determine any issues raised by the [defendant's] response which would except the [defendant] from increased punishment."  If a defendant has not served over a year in prison or was released more than fifteen years before the present

---

**4***See* Gov't Br. at 18-19 ("Section 851's procedure does not encompass the resolution of any term-of-imprisonment-related questions at all. Section 851 sets forth a process for the district court to determine the 'facts regarding prior convictions'—including whether the defendant 'has been previously convicted as alleged in the information,' whether an alleged conviction 'is invalid,' or whether a conviction would not subject a defendant 'to an increased sentence as a matter of law.' 21 U.S.C. § 851(a)(1), (b), (d)(2).  As the district court suggested, questions about the characteristics of the *sentence* a defendant served as a result of a prior conviction are not encompassed by Section 851."); *id.* at 19 (adding that "[a]ny doubt about the scope of the statutory section is resolved by [its] heading, which refers to '[p]roceedings to establish prior convictions'—and not to 'establish' the period of imprisonment the defendant served or other consequences that resulted from the conviction").

offense, those facts "except [him] from increased punishment."  If raised, they fit within § 851's scope.

**3.**

The parties next dispute whether § 851 prevents a court from doing what the court did here: i.e., sending the incarceration-related facts to the jury via a bifurcated proceeding at trial. While we do not agree with the government's precise framing, we ultimately agree that the answer to this close question is "no."

The government argues that nothing in § 851 "mandates that the [district] court *independently* make factual findings, nor prevents the district court from adopting a jury's determinations."  Gov't Br. at 20.  We have trouble with both assertions.  To start, § 851(c)(1) *does* require the court, not a jury, to make certain findings.  It requires the court to hold a hearing to determine "any issues" raised by a defendant's written § 851 response, contemplates that this hearing may involve "facts in addition to the convictions to be relied upon," and provides that the "hearing shall be before the court without a jury and either party may introduce evidence." 21 U.S.C. § 851(c)(1).  It also states that the government "shall have the burden of proof beyond a reasonable doubt on any issues of fact" in the hearing, and that when requested, "the court *shall enter findings of fact* and conclusions of law."  *Id.* (emphasis added).  These sentences (in part) describe an evidentiary hearing.  Clearly, if the jury is not present to evaluate evidence in that hearing, only the court can decide the "issues of fact" raised in it.  It follows that when there are issues left to be resolved in a § 851(c) hearing (i.e., unresolved factual issues raised by the defendant's written § 851 notice), the court is the entity that decides those issues.

There are two problems with the government's argument that nothing in § 851 bars the court from *adopting* the jury's factual findings, as if they were optional recommendations.  First, the court did not purport to "adopt" the jury's findings here.  *See* R. 72 PID 293 ("These post-conviction factual criteria . . . are for the jury alone to evaluate.").  Second, if the Sixth Amendment requires a jury to decide the incarceration-related facts at issue here—as the government argued below and seems to assume on appeal—there could well be a constitutional problem with concluding that a court could treat a jury's findings as "recommendations" it could

choose to adopt or reject. Under that view, the judge, not jury, would make the final factual determination. That would "reduce[] the jury's role 'to the relative importance of low-level gatekeeping.'" *United States v. Booker*, 543 U.S. 220, 230 (2005) (quoting *Jones*, 526 U.S. at 244).

Yet a slightly different framing makes the argument more plausible. Nothing in § 851 expressly forbids a court from sending factual questions to a jury during a bifurcated trial merely because they may come up later in a § 851(c) hearing. The statute is silent on what a court can and cannot do during the trial phase of a criminal proceeding. Fields notes that § 851(c)(1) refers to a hearing "before the court without a jury," and argues that this language expressly precludes the jury's involvement, adding that in *Booker*, the Court read 18 U.S.C. § 3553(a)(1)'s use of the phrase "the court" to "mean 'the judge without the jury,' not 'the judge working together with the jury.'" *Booker*, 543 U.S. at 249. We agree, of course, that the phrase "before the court without a jury" means what it says and precludes a jury's involvement. But the question is how far this language extends—i.e., *at what point* the jury's involvement is precluded. Section 851 clearly requires a court, not a jury, to decide disputed issues *when the § 851 hearing happens*. But a § 851 hearing necessarily cannot occur until a defendant files a written § 851 response. *See* 21 U.S.C. § 851(c)(1). Fields had not filed a § 851 response when phase two of the trial proceeding occurred; therefore, phase two of the trial could not have been a § 851(c)(1) hearing.[5]

---

[5]We also note another problem with Fields's argument, albeit one that the government has not raised. Fields's entire argument hinges on the language in § 851(c)(1) describing the § 851 hearing, emphasizing that § 851(c)(1)'s exclusion of the jury from this hearing necessarily means that the court must decide the Sixth-Amendment-implicating facts that he discusses here. But the scope of the § 851(c)(1) hearing—and, by logical extension, the scope of the purported obligation for the judge (and not the jury) to decide such facts under Fields's argument—is itself defined by what issues a defendant raises in his written response to the § 851 notice. If a defendant does not raise factual objections to the § 851 notice in a written response, there will be no factual issues to resolve in the § 851 hearing, and thus no obligation, even under Fields's argument, for the judge to decide those facts. *See* 21 U.S.C. § 851(c)(1) (describing hearing as applying to resolve "any issues *raised by* the [defendant's] response which would except the [defendant] from increased punishment" (emphasis added)); *see also United States v. Espinal*, 634 F.3d 655, 664 (2d Cir. 2011) ("While § 851(c)(1) requires the government to prove contested facts relating to the prior felony beyond a reasonable doubt, that burden is triggered only where the defendant . . . submits a written response raising a factual issue.").

Fields raised no factual issues in his § 851 response. Indeed, he waited until after trial—and after the jury had found the incarceration-related conditions to be met—to file any § 851 response at all, and that response challenged only the legal characterization of his prior convictions as being for "serious drug felonies." *See* R. 75 PID 303-05; *see also* R. 91 PID 353-58 (supplemental brief objecting to PSR, solely raising challenge to this legal characterization). He had time to do so before trial. The indictment alleged that he had served over a year in prison and was released within fifteen years of the present offense for each of his alleged prior convictions for "serious

And Fields never explains how the statute extends to prohibit the court from sending questions to the jury before the § 851 hearing, during a bifurcated trial.

Because the text does not clearly prohibit what the district court did here, the most Fields can hope to show is that § 851 is capable of competing plausible constructions, including his. But when a "statute is susceptible of 'two plausible . . . constructions,' one of which 'would raise a multitude of constitutional problems, the other should prevail.'" *United States v. Erpenbeck*, 682 F.3d 472, 476 (6th Cir. 2012) (quoting *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005)). To the extent that is the case here, this canon cuts against Fields's reading, which would create constitutional problems that a contrary reading would avoid.[6]

---

drug felon[ies]." R. 1 PID 1-2. And the government filed a § 851 notice in November 2019, just shy of two months before the January 15, 2020 trial started. Indeed, Fields's counsel told the government that he "ha[d] no objection to bifurcation" when the government moved to bifurcate proceedings on January 3, 2020. R. 44 PID 133.

It is difficult to accept Fields's argument that § 851 required the court to refrain from sending facts to the jury that Fields never challenged in a § 851 written objection—the trigger for a § 851 hearing. *Cf. United States v. Hill*, 142 F.3d 305, 313 (6th Cir. 1998) (holding that district court's failure to engage in § 851(b) colloquy was harmless because the defendant never filed § 851(c)(1) response challenging his prior convictions: "there is no reason for a district court to conduct a hearing on the validity of the prior convictions when a defendant fails to first meet the requirements of 21 U.S.C. [§] 851(c), which requires that a defendant give advance notice concerning the basis of his challenge"); *United States v. Denkins*, 367 F.3d 537, 549 (6th Cir. 2004) (same); *United States v. Walker*, 761 F. App'x 547, 552-53 (6th Cir. 2019) (same). Although we recognize it would be pointless to raise such a factual challenge *after* the incarceration-related facts were found at trial, Fields had two months to do so before trial.

[6]There is another problem with Fields's argument. Federal Rule of Criminal Procedure 23(a) states that "[i]f the defendant is entitled to a jury trial, the trial must be by jury unless" the defendant and government waive the jury trial in writing and the court approves. Fed. R. Crim. P. 23(a). The committee notes make clear that this rule aims to codify the requirements of the Sixth Amendment. Fed. R. Crim. P. 23(a) advisory committee's note 1 to 1944 adoption. Rule 23(a) became effective in 1946, while § 851 was enacted in 1970. *See* Fed. R. Crim. P. historical note; Controlled Substances Act, Pub. L. No. 91-513, § 411, 84 Stat. 1242, 1269 (1970). Absent a "clear and manifest" intent, we generally disfavor implied repeals of earlier statutes by later ones, *Rodriguez v. United States*, 480 U.S. 522, 524 (1987) (internal quotation marks omitted); *Beckert v. Our Lady of Angels Apartments, Inc.*, 192 F.3d 601, 606 (6th Cir. 1999), and that principle applies to implied repeals of Federal Rules as well, *Callihan v. Schneider*, 178 F.3d 800, 802-03 (6th Cir. 1999); *Zedner v. United States*, 547 U.S. 489, 507 (2006); *United States v. Borden Co.*, 308 U.S. 188, 198 (1939) ("It is a cardinal principle of construction that repeals by implication are not favored. When there are two acts upon the same subject, the rule is to give effect to both if possible. The intention of the legislature to repeal 'must be clear and manifest.'" (citations and internal quotation marks omitted)). But the practical import of Fields's argument is that § 851 impliedly repeals Rule 23(a)'s requirement to have a jury trial on any issues implicating the Sixth Amendment. So, Fields's argument that § 851 forbids or invalidates the procedure employed here creates a constitutional-avoidance and an "implied-repeal" problem. When statutes are ambiguous, we avoid reading them to create constitutional problems, and in general, we avoid readings that treat a subsequent statute as impliedly repealing a prior statute (or Federal Rule). Fields's reading would do both.

****

In sum, we conclude that the district court's bifurcated procedure in this case did not violate § 851.  Nothing in the statute explicitly forbids the district court from submitting to the jury the factual questions it submitted at the point it did so.

## D.  The "Finality of Conviction" Argument

Fields makes one last challenge to the district court's procedure.  He argues that the district court violated the Sixth Amendment by failing to require the jury to find the "fact" that each of his previous state-law convictions was "final."  Fields Br. at 22.  Fields never requested that the jury make such a finding and never raised this argument below.  We thus review for plain error.

Fields has not shown that any error was "plain."  He cites no cases adopting his position, and "[a] lack of binding case law that answers the question presented will . . . preclude our finding of plain error."  *United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015); *see also United States v. Gonzalez*, 584 F. App'x 188, 190 (5th Cir. 2014) ("Gonzalez is unable to show a clear or obvious error on the question whether the finality of the prior conviction is an issue beyond the fact of a prior conviction.") (citing *Alleyne*, 570 U.S. at 116; *Almendarez-Torres*, 523 U.S. at 239-47)).  The government also points out that Fields has not shown that the error affected his substantial rights, as the plain-error standard requires.  *Cavazos*, 950 F.3d at 334; *see* Gov't Br. at 28-29 ("Fields served his years-long sentence for each conviction and was initially released on parole for those convictions in 2010 and 2014, respectively.  There is no doubt that his prior convictions long ago became final." (citation omitted)).  Fields fails to contest that point in his reply brief.   In short, Fields fails to show that plain error warrants reversal on this argument.

## IV.  THE "SERIOUS DRUG OFFENSE" CHALLENGES

In his second category of challenges, Fields argues that neither of his prior convictions—both for criminal offenses in Kentucky—qualifies as a "serious drug offense."  His first conviction is the Meth-Precursor Offense: a 2006 conviction for violating Kentucky's statute

prohibiting possession of a methamphetamine precursor with intent to manufacture.   The second is the Trafficking Offense: a 2013 conviction for violating Kentucky's drug-trafficking statute. As relevant here, a "serious drug offense" is "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in [21 U.S.C. § 802]), for which a maximum term of imprisonment of ten years or more is prescribed by law[.]"  18 U.S.C. § 924(e)(2)(A)(ii).

To assess Fields's challenges, we use the "categorical approach."  That approach looks only to the statutory definitions of the prior offenses, not the facts underlying each conviction. *Eason*, 919 F.3d at 388.  It asks if the underlying state conviction, "by definition, . . . falls within [the] category" of offenses described by the federal statute. *Mellouli v. Lynch*, 575 U.S. 798, 805 (2015).  We "must presume that the [previous] conviction rested upon nothing more than the least of the acts criminalized under the state statute."  *Id.* (internal quotation marks omitted).  The inquiry is "hypothetical" and asks if "someone [could] commit [the] crime of conviction without" meeting the federal enhancement's criteria. *Pereida v. Wilkinson*, 141 S. Ct. 754, 762 (2021).   But sometimes we must first ask a factual question: "what was [the] crime of conviction?"  *Id.*   This arises when a state law is "divisible," i.e., has "multiple, stand-alone offenses, some of which" meet the federal criteria and "others of which do not."  *Id.* at 762-63. In those cases we use a "modified categorical approach," "consult[ing] a limited class of documents[] to determine which alternative formed the basis of the . . . prior conviction[.]" *Eason*, 919 F.3d at 388 (internal quotation marks omitted).[7]

## A.  The Meth-Precursor Offense

In 2006, Fields was convicted of a first-time violation of Ky. Rev. Stat. § 218A.1437, the meth-precursor statute, for "Unlawful Possession of a Methamphetamine Precursor" and received an enhancement under Ky. Rev. Stat. § 532.080 for being a "persistent felony offender

---

[7]These documents include "the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." *Shepard v. United States*, 544 U.S. 13, 16 (2005).   The laws underlying both of Fields's convictions refer to "methamphetamine" *or* another "controlled substance."  Ky. Rev. Stat. §§ 218A.1437, 218A.1412.  The district court found both laws were divisible and, applying the modified categorical approach, looked to the indictments for both to determine that they involved methamphetamine, not some other controlled substance.  Fields does not challenge that analysis, so we assume the same for purposes of resolving this appeal.

in the first degree." The meth-precursor statute proscribes "knowingly and unlawfully" possessing certain chemicals with intent to use them as a precursor to manufacturing methamphetamine. *Id.* § 218A.1437(1). A first-time violation is a "Class D" felony, *id.* § 218A.1437(3), which carries a five-year maximum sentence "[u]nless otherwise provided by law," *id.* § 532.060(2)(c)-(d). But a "persistent felony offender in the first degree" who commits a Class D felony is subject to at least a ten-year maximum sentence. *Id.* § 532.080(6).

Fields argues that his Meth-Precursor Offense is not a "serious drug offense" because it (1) does not carry a ten-year maximum sentence and (2) does not "necessarily entail" the conduct described in 18 U.S.C. § 924(e)(2)(A)(ii). The first argument is foreclosed by *United States v. Rodriquez*, 553 U.S. 377 (2008),[8] so we focus on the second one. It relies heavily on *Shular v. United States*, 140 S. Ct. 779 (2020). Fields argues that *Shular* requires us to ask whether the Meth-Precursor Offense necessarily entails any of the conduct described in § 924(e)(2)(A)(ii), and that because the Meth-Precursor Offense does not necessarily entail "manufacturing," the only relevant prong of § 924(e)(2)(A)(ii), his enhancement cannot stand. He acknowledges, however, that in 2019 we held that a similar Tennessee statute—barring possession of methamphetamine ingredients with recklessness as to their potential use in manufacturing—*was* a "serious drug offense." *Eason*, 919 F.3d at 390-92. But *Eason* was a pre-*Shular* decision, and Fields argues that because *Eason*'s test—requiring only that the prior offense be related to or connected with the conduct listed in § 924(e)(2)(A)(ii)—is far broader than *Shular*'s, *Eason* should not control our decision here.

Because the Meth-Precursor Offense would constitute a "serious drug offense" under *Eason*'s broader "relates to or connects with" test, but may not under *Shular*'s "necessarily entails" test, our threshold question is which standard applies.

---

[8]Fields's first argument is that the Meth-Precursor Offense is not "punishable by ten years or more imprisonment" because a first-time violation of § 218A.1437 alone—without considering the persistent felony offender enhancement—would only permit five years' imprisonment. But *Rodriquez* held that courts must consider all applicable state recidivism enhancements affecting the defendant's maximum sentence. 553 U.S. at 383-84. In light of *Rodriquez*, Fields's first argument is unavailing.

**1.**

Prior to *Shular*, most circuits, including ours in *Eason*, interpreted the word "involving" in § 924(e)(2)(A)(ii) to require only that a prior state offense "relate to or connect with" the offenses listed in § 924(e)(2)(A)(ii). *See Eason*, 919 F.3d at 390-91 (collecting cases). But a few circuits read "involving" more narrowly. *See United States v. Franklin*, 904 F.3d 793, 800-02 & n.9 (9th Cir. 2018) (rejecting the "relates to or connects with" test as overly broad), *abrogated on other grounds by Shular*, 140 S. Ct. at 784; *United States v. Brandon*, 247 F.3d 186, 191 (4th Cir. 2001) (asking, more narrowly, whether the prior offense "intrinsically involves the proscribed conduct" in § 924(e)(2)(A)(ii), or whether that "conduct is an inherent part or result of the generic [state] crime of conviction"). There are dictionary definitions supporting both views.[9]

At the same time the "relates to or connects with" line of cases developed, courts considering similar provisions outside the § 924(e)(2)(A)(ii) context often interpreted "involving" more narrowly. The most significant example is the Supreme Court's decision in *Kawashima v. Holder*, 565 U.S. 478, 481, 484-85 (2012). Applying the categorical approach, *Kawashima* held that an immigration statute providing for removal upon commission of an offense that "involves fraud or deceit" applies to "offenses with elements that *necessarily entail* fraudulent or deceitful conduct." *Id.* (emphasis added). Several decisions in other contexts have taken similar approaches.[10]

---

[9]For example, one entry in Merriam Webster defines "involve" to mean "to have within or as part of itself: Include," or "to require as a necessary accompaniment: Entail," which hews closely to the narrower *Brandon* articulation; but another entry defines the word to mean "to relate closely: Connect," which echoes the "relates to or connects with" formulation. *Involve*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/involve (last accessed Aug. 2, 2022).

[10]*See, e.g., Lovano v. Lynch*, 846 F.3d 815, 817 (6th Cir. 2017) (describing BIA interpretation of statutory phrase "crime involving moral turpitude" as asking whether prior crimes "necessarily entail[] conduct" reaching certain levels of culpability); *United States v. Reliford*, 471 F.3d 913, 916 (8th Cir. 2006) (applying a "necessarily entails" test to determine, under 18 U.S.C. § 924(e)(2)(B)(ii), whether a prior offense "otherwise involves conduct that presents a serious potential risk of physical injury to another"); *United States v. Montgomery*, 402 F.3d 482, 488 (5th Cir. 2005) (same); *United States v. Scheels*, 846 F.3d 1341, 1342 (11th Cir. 2017) (per curiam) (noting that "[t]he ordinary meaning of 'involve,'"—as used in U.S.S.G. § 2G2.1(b)(4)'s enhancement for offenses that "*involve*[] material that portrays sadistic or masochistic conduct"—"is '[t]o have as a necessary feature or consequence; entail,' or 'to have within or as a part of itself'" (emphasis added) (citations omitted)); *United States v. Lachowski*, 405 F.3d 696, 699 (8th Cir. 2005) (applying similar definition to interpret word "involving" in

*Shular* appeared to adopt the *Kawashima* interpretation of "involves" in the § 924(e)(2)(A)(ii) context. The parties in *Shular* disagreed on the type of categorical analysis § 924(e)(2)(A)(ii) calls for. Thedefendant argued for a "generic-offense matching exercise," under which state-law convictions only constitute "serious drug offenses" if their elements match the *elements* of the "generic" versions of the offenses listed in § 924(e)(2)(A)(ii). 140 S. Ct. at 783-84. The government argued that the *Kawashima* test should apply instead, which requires courts to ask if the elements of the prior offense necessarily entail *conduct* described in § 924(e)(2)(A)(ii), without the need to define a generic offense. The Court concluded that the government's reading was the correct one. *See id.* at 784-85 ("In the Government's view, a court should apply 'the *Kawashima* categorical approach': It should ask whether the state offense's elements 'necessarily entail one of the types of *conduct*' identified in § 924(e)(2)(A)(ii) . . . . The Government's reading, we are convinced, correctly interprets the statutory text and context.").

Post-*Shular*, several circuits that previously applied (or favorably cited cases applying) the "relates to or connects with" test have recognized that *Kawashima*'s "necessarily entails" test now governs in § 924(e)(2)(A)(ii) contexts. *See United States v. Godinez*, 955 F.3d 651, 656-57 (7th Cir. 2020); *United States v. Coleman*, 977 F.3d 666, 669-70 (8th Cir. 2020); *United States v. Smith*, 983 F.3d 1213, 1223 (11th Cir. 2020).[11] The Ninth Circuit—which rejected this

---

21 U.S.C. § 853(q), which provides for restitution for crimes "involving the manufacture of amphetamine or methamphetamine").

[11]For pertinent pre-*Shular* decisions from these circuits, *see United States v. Williams*, 931 F.3d 570, 575 (7th Cir. 2019); *United States v. Bynum*, 669 F.3d 880, 886-87 (8th Cir. 2012); *see also United States v. Smith*, 775 F.3d 1262, 1267 (11th Cir. 2014) (noting that § 924(e)(2)(A)(ii) "require[s] only that the predicate offense 'involv[es]' . . . certain activities *related to* controlled substances" (alteration in original) (emphasis added)); *United States v. White*, 837 F.3d 1225, 1233 (11th Cir. 2016) (stating that several cases in the "relates to or connects with" line of decisions have "likewise adopted an expansive interpretation of the word 'involving'"). The Fifth Circuit—another prior adherent to the broader version of the test, *see United States v. Vickers*, 540 F.3d 356, 365 (5th Cir. 2008)—recently discussed (but declined to rule on) *Shular*'s impact on the "relates to or connects with" test. *United States v. Prentice*, 956 F.3d 295 (5th Cir. 2020). The court assumed without deciding that the defendant was correct when he argued that *Shular* endorsed a narrower understanding of "involving" than *Vickers* did, but held that even under *Shular*, the prior crime at issue was a "serious drug offense." *Id.* at 299. The panel noted, however, that *Shular* "altered" the rationale of its pre-*Shular* caselaw. *See id.* ("*Shular* altered the rationale underlying *Vickers*, but not its result."); *id.* at 300 ("The precise reasoning of *Vickers*, *i.e.*, its interpretation of 'involving,' differs from that of *Shular* and seems at odds with *Shular*'s focus on the underlying *conduct* charged in state offenses."). Similarly, although the First Circuit previously read "involve" to mean "relate closely" or "connect closely" when construing § 924(e)(2)(A)(ii) (but added that "involving" should not be read too broadly), *United States v. McKenney*, 450 F.3d 39, 43, 45 (1st Cir. 2006), it later applied *Shular*'s "necessary" approach when construing

broader test pre-*Shular*, *see Franklin*, 904 F.3d at 800-02 & n.9—has recognized the same in a post-*Shular* decision. *United States v. Davis*, 806 F. App'x 572, 574 (9th Cir. 2020).

One panel is usually bound by the ruling of a previous one, but there is an exception to that rule when the Supreme Court issues an intervening decision that is directly on point. *Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 720-21 (6th Cir. 2016). That exception applies even when the intervening Supreme Court decision is *not* "precisely on point" but provides "directly applicable" legal reasoning, *id.*, or when it provides on-point dictum, *see In re Baker*, 791 F.3d 677, 682-83 (6th Cir. 2015) (stating that on-point Supreme Court dictum in bankruptcy case governed rather than prior panel holding, to extent the two conflicted). Here, *Shular* is directly on point. It held that the government "correctly" read § 924(e)(2)(A)(ii), and the government had asserted that the statute calls for courts to "ask whether the state offense's elements 'necessarily entail one of the types of *conduct*' identified in § 924(e)(2)(A)(ii)." *Shular*, 140 S. Ct. at 784-85. To the extent that this "necessarily entails" test was part of the Court's underlying rationale for adopting the government's conduct-based interpretation, we are bound to follow it. *See Ne. Ohio Coal. for the Homeless*, 813 F.3d at 721.

We are aware of no circuit decisions declining to follow *Shular*'s discussion of the "necessarily entails" test on the basis that it was dictum. And some decisions have expressly stated that this discussion was part of *Shular*'s holding. *See Smith*, 983 F.3d at 1223 ("The Supreme Court held that a court determining whether an offense qualifies as a serious drug offense need only consider whether the offense's elements 'necessarily entail' the types of conduct identified in the ACCA's definition rather than engage in a 'generic-offense matching exercise.'" (quoting *Shular*, 140 S. Ct. at 783-84)); *United States v. Curry*, 833 F. App'x 328, 329 (11th Cir. 2020) (same). But we note that *after Shular* stated that the government "correctly" read § 924(e)(2)(A)(ii) as requiring courts to apply the "*Kawashima* categorical approach," it noted—in a single sentence three paragraphs later—that the parties agreed on

---

"involving" as used in another statutory provision, *United States v. Sandoval*, 6 F.4th 63, 108-10 (1st Cir. 2021). And we recently recognized, albeit when interpreting a Guidelines provision rather than § 924(e)(2)(A)(ii), that *Shular*'s narrower understanding of "involve" may be at odds with *Eason*'s broader understanding of the term. *United States v. Gould*, 30 F.4th 538, 545-46 (6th Cir. 2022); *see also United States v. Winn*, No. 20-1477, 2022 WL 636633, at *4 n.7 (3d Cir. Mar. 4, 2022) (recognizing that *Shular* introduced a new approach).

the dictionary definition of "involve" as meaning "necessarily require." *Shular*, 140 S. Ct. at 783-85.**[12]** The same is the case here.

Though no party raises it, we can imagine an argument that *Shular*'s recognition of party agreement on that definition somehow deprived its discussion of the "necessarily entails" test of any precedential value. A close reading of *Shular*, however, cuts the other way. It is true that the parties agreed on the definition of "involving," but they did not agree on the test to apply in § 924(e)(2)(A)(ii) cases. That was the dispute the Court aimed to resolve. *See id.* at 782 ("This case concerns the methodology courts use to apply that definition."); *id.* at 783-84 (describing the generic element-matching test and then the *Kawashima* "necessarily entails" test, then stating, "[t]his case invites us to decide which of the two categorical methodologies just described applies").

The Court set up and resolved that dispute by describing both parties' proposed approaches and affirmatively choosing the government's test. *See id.* at 784-85 ("In the Government's view, a court should apply 'the *Kawashima* categorical approach' [and] ask whether the state offense's elements 'necessarily entail one of the types of *conduct* identified in § 924(e)(2)(A)(ii). . . . The Government's reading, we are convinced, correctly interprets the statutory text and context."). The Court's recognition—in a single sentence, three paragraphs later—that the parties agreed on the dictionary definition of "involve" does not erase its previous articulation of its *own* position: that the government's interpretation (that the *Kawashima* test applies) was the "correct[]" one. *Id.* at 785.

The view that *Shular*'s holding focused *solely* on whether § 924(e)(2)(A)(ii) referred to *conduct* or *generic elements*, and that any comment on the applicable test (i.e., *Kawashima*'s test or something else) was extraneous carves out the Court's explicit recognition that the

---

**[12]***See id.* at 785 ("[B]y speaking of activities a state-law drug offense 'involv[es],' § 924(e)(2)(A)(ii) suggests that the descriptive terms immediately following the word 'involving' identify conduct. The parties agree that 'involve' means 'necessarily requir[e].' Brief for Petitioner 14 (citing Random House Dictionary of the English Language 1005 (2d ed. 1987) ('to include as a necessary circumstance, condition, or consequence')); Brief for United States 21 (same). It is natural to say that an offense 'involves' or 'requires' certain conduct. . . . To refer to offenses as Shular urges, it would have been far more natural for the drafter to follow the enumerated-offense clause in using 'is,' not 'involving.' Yet Congress did not adopt that formulation in § 924(e)(2)(A)(ii), opting instead for language suited to conduct." (citations omitted)).

government "correctly interpreted" § 924(e)(2)(A)(ii) as requiring inquiry into whether a state offense's elements "necessarily entailed" the conduct listed in the provision.  This view also supposes that the Court—despite setting out to identify the correct "methodology courts use to apply" the serious-drug-offense definition, *id.* 782—chose to *avoid* articulating the proper test, and that it did so without noting that it did not intend its articulation of the "correct[]" test to be binding.

Further, *Shular* resolved a dispute over whether the generic-offense test or some other test applied.  One side said the generic-offense test applied while the other said the *Kawashima* test applied.  The Court said the latter represented a correct reading of the statute.  That statement—that *Kawashima*'s test is the "correct[]" one—was part of its answer to the central issue raised in the case.  That statement was not dictum, *see Wright v. Spaulding*, 939 F.3d 695, 701 (6th Cir. 2019) ("The decision of the issue must contribute to the judgment[.]"), and, at minimum, is certainly an intervening on-point statement of the Court.**13**  Further, as Judge Murphy thoughtfully explains in his separate opinion, it is the better understanding of the word "involve."

We thus conclude that we should follow *Shular* and now ask whether the elements of Fields's state offenses "necessarily entail" conduct described in § 924(e)(2)(A)(ii).  All agree that "manufacturing" is the only conduct implicated.  So, we ask if the Meth-Precursor Offense "necessarily entails" manufacturing.

---

**13**But even if the statement were dictum—a proposition we have not seen any post-*Shular* courts definitively endorse—we would still follow it here.  "Honoring intervening Supreme Court authority is a critical duty for any lower court, including ours." *Williams v. Burt*, 949 F.3d 966, 977 (6th Cir. 2020); *see also Ne. Ohio Coal. for the Homeless*, 831 F.3d at 721 ("[L]ower courts are 'bound not only by the holdings of higher courts' decisions but also by their 'mode of analysis'" (quoting *Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014))).  Accordingly, our circuit has repeatedly stated that we must give on-point Supreme Court dictum substantial weight. *See, e.g.*, *Holt v. City of Battle Creek*, 925 F.3d 905, 910 (6th Cir. 2019) ("Even if the Supreme Court's statement in *Encino* was dicta outside of the context of the salesman exemption, '[l]ower courts are obligated to follow Supreme Court dicta, particularly where there is not substantial reason for disregarding it, such as age or subsequent statements undermining its rationale.'" (quoting *In re Baker*, 791 F.3d at 682; *Murray v. U.S. Dep't of Treasury*, 681 F.3d 744, 750 n.5 (6th Cir. 2012); *ACLU of Ky. v. McCreary County*, 607 F.3d 439, 447 (6th Cir. 2010); *United States v. Marlow*, 278 F.3d 581, 588 n.7 (6th Cir. 2002); *United States v. Morgan*, 572 F. App'x 292, 301 (6th Cir. 2014).  There is no substantial reason to disregard *Shular*'s indication that the narrow interpretation of "involve" applies under § 924(e)(2)(A)(ii).

**2.**

Section 924(e)(2)(A)(ii) does not define "manufacture" but the Controlled Substances Act does. It defines manufacture to "mean[] the production, preparation, propagation, compounding, or processing of a drug or other substance, either directly or indirectly or by extraction from substances of natural origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis[.]" 21 U.S.C. § 802(15). When used in connection with a word like "substance" or "drug," the words in this definition connote (1) the creation of a final product from component ingredients and (2) the initiation of a *process* for doing so.**[14]**

Statutory context indicates that § 802(15)'s definition of "manufacture" does not encompass mere possession of a precursor with intent to manufacture. Congress chose to create separate substantive offenses for "manufacturing" (*see* 21 U.S.C. § 841(a)(1)), on the one hand, and possession of ingredients with intent to manufacture, on the other, *see, e.g.*, *id.* §§ 841(c)(1), 843(a)(6). Reading § 802(15)'s definition of "manufacture" to include possession with intent to manufacture would collapse the distinction between these crimes; and if Congress meant the word "manufacture" to include possession with intent, it would have been pointless to treat that conduct as a crime separate from the substantive offense of manufacturing.

---

**[14]**"Produce," "prepare," and "compound" describe the creation of a final product from several ingredients; "produce" and "prepare" also refer to engaging in a *process* to do so, as do "propagate" and "process." *See id.* § 802(22) (defining "production" to "includ[e] the manufacture, planting, cultivation, growing, or harvesting of a controlled substance"); *Produce*, OXFORD ENGLISH DICTIONARY, https://tinyurl.com/3szjh3dd (last accessed Aug. 2, 2022) (to "bring (a thing) into existence from its raw materials or elements, or as the result of a process"); *Preparation*, OXFORD ENGLISH DICTIONARY, https://tinyurl.com/2bvr7ryz (last accessed Aug. 2, 2022) (the "action or process of specially producing or making up a thing in its proper condition for use or consideration . . . the making of a chemical compound, drug, etc., from appropriate starting materials"); *Prepare*, OXFORD ENGLISH DICTIONARY, https://tinyurl.com/5a55f26z (last accessed Aug. 2, 2022) ("To produce, form, or make, esp. by bringing together ingredients or components; to manufacture; to synthesize, concoct, compound. . . . To bring (an object, substance, surface, etc.) into a fit condition for use by means of some special or technical process"); *Compound*, OXFORD ENGLISH DICTIONARY, https://tinyurl.com/p7pdjp79 (last accessed Aug. 2, 2022) ("To make up (a composite product) by the mixture of combination of various ingredients or elements"). *Process*, OXFORD ENGLISH DICTIONARY, https://tinyurl.com/3hjcbsbj (last accessed Aug. 2, 2022) ("To subject to or treat by a special process; to operate on mechanically or chemically."); *Propagate*, OXFORD ENGLISH DICTIONARY, https://tinyurl.com/ejs36j4c (last accessed Aug. 2, 2022) ("[T]o cause (a plant, animal, etc.) to reproduce or multiply.").

**3.**

The Kentucky meth-precursor statute prohibits the "unlawful possession" of a "drug product or combination of drug products containing ephedrine, pseudoephedrine, or phenylpropanolamine, or their salts, isomers, or salts of isomers, with the intent to use the drug product or combination of drug products as a precursor to manufacturing methamphetamine or other controlled substance." Ky. Rev. Stat. § 218A.1437(1).[15]

In Kentucky's methamphetamine-focused statutory framework, the meth-precursor statute sits near the bottom of the ladder. It applies when someone possesses *one* of the chemicals listed in § 218A.1437(1) with intent to manufacture methamphetamine. Possession of two or more of those chemicals—or any others used for manufacturing methamphetamine—is a more serious Class B felony under Kentucky's methamphetamine-manufacturing statute. *Id.* § 218A.1432(1)(b). That statute proscribes "knowingly and unlawfully" (a) manufacturing methamphetamine or (b) "[w]ith intent to manufacture methamphetamine possess[ing] two (2) or more chemicals or two (2) or more items of equipment for the manufacture of methamphetamine." *Id.* § 218A.1432(1)(a)-(b).

The "only difference" between the meth-precursor statute and the chemical-possession subsection of the methamphetamine-manufacturing statute is that "the manufacturing-methamphetamine statute requires possession of additional contraband beyond that necessary for a possession-of-a-methamphetamine-precursor conviction." *Sevier v. Commonwealth*, 434 S.W.3d 443, 451-52 (Ky. 2014) (noting that the methamphetamine-manufacturing statute's chemical-possession prong has, for practical purposes, the same "intent" element as the meth-precursor statute and "simply requires proof of an *additional* fact"—"possession of an additional chemical").

The Kentucky Supreme Court has stated that both the meth-precursor statute and "chemical-possession" prong of the methamphetamine-manufacturing statute can be violated

---

[15]Some of the chemicals listed in this statute are available in over-the-counter products that can be legally purchased at pharmacies. For example, pseudoephedrine is found in the over-the-counter cold medicine, Sudafed. *See Hayes v. Commonwealth*, 175 S.W.3d 574, 580 (Ky. 2005) ("Sudafed is a cold medication containing pseudoephedrine, a precursor used to manufacture methamphetamine.").

before it is even possible to begin the manufacturing process. *See Kotila v. Commonwealth*, 114 S.W.3d 226, 240 (Ky. 2003) ("KRS § 218A.1437(1) . . . [was] intended to fill the gap where there is proof of possession of a methamphetamine precursor . . . but not proof of possession of . . . other chemicals necessary to manufacture methamphetamine.")[16]; *Sizemore v. Commonwealth*, 2011 WL 317474 at *3 (Ky. Jan. 27, 2011) (noting that § 218A.1432(1)(b) does "not actually require that [the defendant] had been actively 'involved' in manufacturing methamphetamine" or the "'manufacturing process'"); *id.* (adding that statute requires no "immediate intent to manufacture" and "impl[ies] that an intent to manufacture at some point in the future would suffice").

**4.**

With that understanding, we turn to the parties' arguments. The government argues that the meth-precursor statute requires intent to manufacture and therefore necessarily entails manufacturing. Fields replies that intent to take an action does not necessarily mean the action will occur and argues that the statute plainly does not require that someone manufacture a controlled substance. Fields is correct.

To start, Kentucky's Supreme Court has specifically recognized that the meth-precursor statute was meant to apply when a defendant was not yet even *capable* of manufacturing methamphetamine because he did not yet possess the materials necessary to do so. *Kotila*, 114 S.W.3d at 240. It is hard to say that a statute tailored to situations where manufacture is not yet possible "necessarily entails" manufacturing conduct. Indeed, when a defendant possesses more

---

[16]*Kotila* has been partially abrogated, but not the proposition in the cited passage. *Kotila* held that a previous version of the meth-manufacturing statute—which only referred to possession of "*the*" chemicals or equipment used in methamphetamine manufacture, as opposed to "two (2) or more" of either—required possession of *all* the chemicals or *all* the equipment necessary to manufacture methamphetamine. 114 S.W.3d at 236-37. *Kotila* was abrogated by statute in 2005 when the legislature expressly added the "two (2) or more" language. And *Matheney v. Commonwealth*, 191 S.W.3d 599, 602-04 (Ky. 2006) overruled *Kotila*'s interpretation of the pre-amendment version of the statute, holding that this version also required only possession of two or more (not *all*) chemicals or pieces of equipment. *Kotila*'s recognition that § 218A.1437 fills a gap remains correct, but the size of the gap has shrunk. *Kotila* said § 218A.1437 applied where a defendant possesses a methamphetamine precursor but did not possess "*all of the* other chemicals necessary to manufacture methamphetamine." 114 S.W.3d at 240 (emphasis added). But after *Matheney* and the 2005 statutory amendment, it is more accurate to say that the meth-precursor statute occupies a gap where a defendant possesses a precursor but there is no proof of possession of *any other* chemicals used to manufacture methamphetamine. Once a defendant possesses any second chemical, § 218A.1432(1)(b) would apply instead.

than one methamphetamine ingredient, the harsher § 218A.1432(1)(b) statute would apply instead. *Sevier*, 434 S.W.3d at 451-52. And the Kentucky Supreme Court has expressly stated that even that statute does not "actually require that [the defendant] had been actively 'involved' in manufacturing methamphetamine" or the "'manufacturing process.'" *Sizemore*, 2011 WL 317474 at *3. That observation necessarily applies to the meth-precursor statute as well, given that the two statutes target the same conduct and intent. *Sevier*, 434 S.W.3d at 451-52.

These statements from the Kentucky Supreme Court show that the answer to our dispositive question—whether a violation of § 218A.1437(1) necessarily entails "manufacturing" methamphetamine—is "no." So does common sense. Consider a variation on the district court's hypothetical: "somebody is in a drugstore and shoplifts a pack of Sudafed with the intent to take it to a [methamphetamine] cook" a month later, but is arrested right after leaving the store.[17] It is hard to see how that person was "manufacturing" methamphetamine. Because the person does not yet have ingredients other than pseudoephedrine (if he did, he would be facing § 218A.1432(1)(b) charges instead), he necessarily cannot yet begin the process of combining ingredients to form a finished product.

The government asserts that because a defendant convicted of the Meth-Precursor Offense must have an intent to manufacture, "the necessary result or consequence of his possession [is] the manufacture of methamphetamine." Gov't Br. at 35. This logic does not hold together. Intent to take an action does not necessarily mean the action will occur. The shoplifter example bears that out. Because the shoplifter was arrested, no manufacturing process ever began.[18]

Believing that *Eason* decides the issue, the district court reached the opposite conclusion. To be sure, *Eason* is analogous; it found a conviction under a similar state statute to be a "serious drug offense." 919 F.3d at 387-92. But *Eason* asked if that offense "related to or connected

---

[17]*Cf. Pittman v. Commonwealth*, 2007 WL 1195442 at *1 (Ky. Ct. App. Apr. 6, 2007) (describing indictment for meth-precursor offense after defendant was caught "stealing sudafed from a Kroger [pharmacy] store").

[18]Everyday examples suggest the same. For example, if a baker goes to the store on Monday to buy some ingredients for a cake to be made on Saturday, nobody would say the baker had begun making the cake upon leaving the store on Monday.

with" manufacturing, a far broader (and more elastic) question. *See Mellouli*, 575 U.S. at 811-12 (noting that phrases like "relating to[] are broad and indeterminate" and "stop nowhere" when "extended to the furthest stretch of their indeterminacy" (citations, alterations, and internal quotation marks omitted)).[19]  Possessing a precursor with intent to manufacture may "relate to and connect with" manufacturing, but the *Shular* question is whether it "necessarily entails" manufacturing.  The latter test is narrower, and *Eason* never applied it.

The government makes one last argument: it points out that another provision of the "serious drug offense" definition covers any offense under the Controlled Substances Act (CSA) with a maximum sentence of ten or more years, 18 U.S.C. § 924(e)(2)(A)(i); contends that possessing a precursor with intent to manufacture would amount to a CSA offense for possessing certain kinds of chemicals with intent to manufacture under 21 U.S.C. § 843(a)(6) (which provides a ten-year maximum sentence when applied to methamphetamine, *id.* § 843(d)(2)); and argues that Congress "could [not] have intended to exclude state offenses that necessarily require the intent to use a substance to manufacture methamphetamine, because that same conduct, when charged under [§ 843(a)(6)], qualifies as a 'serious drug offense.'"  Gov't Br. at 36.

Again, we are not persuaded.  We are interpreting § 924(e)(2)(A)(ii) here, not § 924(e)(2)(A)(i).  If Congress wanted, it could have defined "serious drug offense" to include any state-law offense that, had it been prosecuted federally, would have fit the criteria described in § 924(e)(2)(A)(i).  Elsewhere, it has done just that.  *See, e.g.*, 18 U.S.C. § 3559(c)(2)(H)(i)-(ii) (defining the term "serious drug offense," in a different context, to mean either an offense under certain federal drug-law provisions or a state-law offense "that, had [it] been prosecuted in a [federal] court . . . would have been punishable under" those same federal provisions).  But it chose not to here.  The categorical approach requires us to focus on the words Congress used in

---

[19]*Accord Maracich v. Spears*, 570 U.S. 48, 59-60 (2013) ("The phrase 'in connection with' is essentially 'indeterminat[e]' because connections, like relations, 'stop nowhere.'  So the phrase 'in connection with' provides little guidance without a limiting principle[.]" (citations omitted); *id.* at 60 ("[A]pplying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." (quoting *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring)); *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) ("If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for '[r]eally, universally, relations stop nowhere.'" (citation omitted)).

the enhancement being applied. The government's final argument strays too far afield from that task.[20]

In short, it is possible to violate the meth-precursor statute without committing manufacturing conduct. Accordingly, the Meth-Precursor Offense does not "necessarily entail" manufacturing under § 924(e)(2)(A)(ii) and does not constitute a "serious drug offense."

## B. The Trafficking Offense

Fields also argues that his second state-court conviction—for first degree trafficking in a controlled substance, in violation of Ky. Rev. Stat. § 218A.1412—does not constitute a "serious drug felony." This provision prohibited "knowingly and unlawfully traffic[king]" in a number of drugs, including "methamphetamine." Ky. Rev. Stat. § 218A.1412(1) (effective June 8, 2011 to March 24, 2015). Fields argues that this offense is overly broad because at the time of his offense (2012/13), an over-the-counter inhaler containing certain levels of levmetamfetamine would have fit within Kentucky's definition of an illegal "methamphetamine," while federal regulations exempted the same kind of over-the-counter inhaler.

The categorical approach's directive to "focus on the minimum conduct criminalized by the state statute is not an invitation to apply 'legal imagination' to the state offense; there must be 'a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside [the federal statute's coverage].'" *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013) (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007)). The defendant "must at least point to his own case or other cases in which the state courts in fact did apply the statute in the special . . . manner for which he argues." *Duenas-Alvarez*, 549 U.S. at 193. Fields fails to do so.

---

[20]And as noted above, the government's reference to 21 U.S.C. § 843(a)(6), if anything, hurts its position. Congress chose to make "manufacturing" and possession of chemicals with intent to manufacture separate crimes, under 21 U.S.C. §§ 841(a)(1) and 843(a)(6), respectively. If we interpret 21 U.S.C. § 802(15)'s definition of "manufacture" to include possession of chemicals with intent to manufacture, we would partially collapse the distinction between these two crimes, because anytime someone possessed chemicals with intent to manufacture, they would also (under such a reading) be guilty of manufacturing. If anything, the existence of § 843(a)(6) underscores that § 802(15)'s definition of "manufacture" does *not* include possession with intent to manufacture, because any other reading would render other substantive portions of the CSA superfluous.

And as the government points out, the hypothetical prosecution Fields describes is highly unrealistic. Since 2005, a Kentucky statute required the state agency responsible for scheduling controlled substances to "exclude any nonnarcotic substance from a schedule if the substance may be lawfully sold over the counter without prescription" under the Federal Food, Drug, and Cosmetic Act (FDCA) or the Federal Comprehensive Drug Abuse Prevention and Control Act of 1970. Ky. Rev. Stat. § 218A.020(4). The FDA exempted the inhaler Fields mentions from federal schedules in 2010, two years before his 2012 Trafficking Offense. *See* 75 Fed. Reg. 13678, 13678 (Mar. 23, 2010) (final rule categorizing this inhaler as a "nonnarcotic drug product[] which may be lawfully sold over the counter without a prescription under the [FDCA]"). Fields accurately notes that by 2012, the relevant state agency had not yet exempted the inhaler from state schedules. *See* 902 K.A.R. 55:040 (2012 ed.).[21] But a Kentucky statute required the inhaler to be exempted. As the government argues, it is highly improbable that Kentucky would prosecute someone for "trafficking" in an over-the-counter inhaler that its own statutes required to be exempted from state schedules. That, along with Fields's failure to cite any examples of such a prosecution, is fatal to this argument. *Duenas-Alvarez*, 549 U.S. at 193.[22]

Finally, in a barely developed argument, Fields argues that the Kentucky trafficking statute is overly broad because Kentucky's definition of "trafficking" includes "dispensing," which is "excepted from 18 U.S.C. § 924(e)(2)(A)(ii)." Fields Br. at 31. Fields looks to *United States v. Goldston* to support this assertion. 906 F.3d 390 (6th Cir. 2018). In that case, however, we rejected the argument that Tennessee's definition of "deliver" was overly broad for including "dispensing" because Tennessee does not actually criminalize "dispensing" in that by definition dispensing can only occur "by or pursuant to the *lawful* order of a practitioner." *Id.* at 395

---

[21]Kentucky eventually amended its regulations in 2017 to simply exclude all over-the-counter products excluded from federal schedules, as opposed to enumerating each excluded product. 902 K.A.R. 55:040 (2017 ed.).

[22]Fields cites two of our decisions that, he says, held state-law offenses categorically overbroad where the overbreadth was "plain" from the statute, even without identification of any state-court cases demonstrating the precise type of prosecution that would render the statute overbroad. Reply Br. at 27-28 (citing *United States v. Lara*, 590 F. App'x 574 (6th Cir. 2014); *United States v. McGrattan*, 504 F.3d 608, 614 (6th Cir. 2007)). But both decisions concluded that there was a "realistic possibility" that the potentially overbroad prosecution could occur— and they cited either out-of-state cases featuring prosecutions under a similar statute (*Lara*) or in-state cases addressing prosecutions for related issues (*McGrattan*). *Lara*, 590 F. App'x at 584; *McGrattan*, 504 F.3d at 614-15. Fields relies on a uniquely *unrealistic* possibility and cites no cases in support.

(quoting Tennessee law). Under Kentucky's statutory scheme, "[d]ispens[ing]" is also defined as "deliver[ing] a controlled substance . . . by or pursuant to the lawful order of a practitioner," Ky. Rev. Stat. § 218A.010(11), which, following *Goldston*'s reasoning and the fact that Fields cites no other case to support his argument, makes it equally unrealistic that Kentucky would apply § 218A.1412 to conduct falling outside § 924(e)(2)(A)(ii)'s coverage. *Cf. Goldston*, 906 F.3d at 395-97; *see also United States v. Fox*, No. 20-6039, 2021 WL 3747190 at *2-4 (6th Cir. Aug. 25, 2021) (concluding that "Kentucky's first-degree drug-trafficking qualifies as a 'serious drug felony' under the First Step Act"). Thus, we reject Field's final argument.

## V. CONCLUSION

In sum, we reject Fields's challenges to the procedure used to impose his enhancement and his argument that the Trafficking Offense was not a "serious drug offense." We agree with Fields that the Meth-Precursor Offense was not a "serious drug offense" and therefore cannot serve as a "serious drug felony" for purposes of Fields's twenty-five-year-mandatory-minimum enhancement. We therefore VACATE Fields's sentence and REMAND for resentencing consistent with this opinion.

---

**CONCURRENCE**

---

MURPHY, Circuit Judge, concurring.  I concur in Judge White's excellent opinion for the court.  I write to add a few more thoughts on whether we should follow the narrow interpretation of the word "involving" from *Shular v. United States*, 140 S. Ct. 779 (2020), or stick with the broad interpretation from *United States v. Eason*, 919 F.3d 385 (6th Cir. 2019).  I find the issue difficult.  We have a duty to follow a published precedent like *Eason*, and its reading comports with the near consensus of courts that considered this issue before *Shular*.  Yet *Shular*'s reasoning calls *Eason* into doubt.  And the federal government—which appears to have changed positions between *Eason* and *Shular*—does not ask us to follow *Eason*'s broad interpretation as a precedential matter.  At day's end, I view *Shular*'s reading as the correct one.  And because *Shular* allows us to depart from *Eason* under our precedent on precedent, we should adopt that reading here.

I

Several federal drug laws increase the length of a defendant's sentence if the defendant has one or more prior convictions for a "serious drug felony," a phrase that incorporates the Armed Career Criminal Act's definition of "serious drug offense."  21 U.S.C. §§ 802(57), 841.  The Armed Career Criminal Act, in turn, defines "serious drug offense" to cover "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance" if the offense has a maximum punishment of ten or more years in prison.  18 U.S.C. § 924(e)(2)(A)(ii).  This definition raises a recurring question of great importance for defendants convicted of various drug or firearm offenses.  Suppose a defendant has previously committed a state crime like attempting to manufacture drugs, conspiring to distribute drugs, or possessing an ingredient with an intent to manufacture drugs.  Do these inchoate crimes "involve" drug "manufacturing" or "distributing" under § 924(e)(2)(A)(ii) even if a person can accomplish them without engaging in anything that resembles manufacturing or distributing?

This case brings us to a fork in the road on this question.  Down one path, we could continue to follow *Eason*.  That decision treated these types of incomplete crimes as "serious drug offenses" even if a defendant could commit them without manufacturing or distributing drugs (or possessing drugs with the required intent).  919 F.3d at 390–92; *see also United States v. Myers*, 925 F.3d 881, 884–86 (6th Cir. 2019); *Young v. Quintana*, 2019 WL 11863648, at *4 (6th Cir. May 15, 2019).  *Eason* considered a Tennessee law that barred a person from buying a methamphetamine ingredient with reckless disregard as to whether the ingredient would be used to make methamphetamine.  919 F.3d at 388–89.  There, we interpreted the statutory definition's key word—involving—to mean "related to or connected with[.]"  *Id.* at 390 (citation omitted).  And while a defendant could commit the crime by merely buying an ingredient (without starting the manufacturing process), we found that this conduct was related to manufacturing because it was "an essential first step to the drug's manufacture."  *Id.* at 391.  This broad reading adopted the government's position in *Eason*: "The test should be whether the prior conviction was 'related to or connected with' drug manufacture, distribution, or possession with intent to manufacture or distribute, as long as the relationship is not 'too remote or tangential.'"  Brief for the United States at 13, *Eason*, 919 F.3d 385 (No. 18-5387), 2018 WL 3218556 (citation omitted).

Down the other path, we could follow language from *Shular*.  That language suggests that we should exclude these inchoate crimes from the definition of "serious drug offense" if a defendant could commit them without manufacturing or distributing drugs (or possessing them with the required intent).  *See* 140 S. Ct. at 785.  *Shular* considered the process that courts should follow to decide whether a state offense qualifies as a "serious drug offense."  *Id.* at 782.  The defendant argued that courts should identify the elements of a "generic" manufacturing, distributing, or possessing offense and ask whether the defendant's crime contains all elements of this court-identified "generic" crime.  *Id.*  The government responded that courts should ask simply whether the defendant's crime will always "involve" the listed behavior—manufacturing drugs, distributing drugs, or possessing drugs with the required intent.  *Id.*  The Court adopted the government's view because, unlike extortion or burglary, things like "manufacturing" or "distributing" are not "generic" offenses with well-established elements.  *Id.* at 785.  The Court added that the statute's use of the verb "involve" (instead of "is") more naturally called for a

conduct-based approach than a generic-offense approach. *Id.* When making this latter point, the Court noted that both parties (including the government) agreed that "involve" narrowly means "necessarily requir[e]" (not "relate to"). *Id.* (citation omitted). The government thus abandoned in *Shular* the broad definition of "involve" it asked our court to adopt in *Eason*.

## II

Which path should we choose now? Should we continue to apply *Eason*'s broad definition ("relate to")? Or should we switch to *Shular*'s narrow definition ("necessarily entail" or "necessarily require")? This question raises tricky procedural and substantive questions.

## A

Two factors suggest that we should stick with *Eason*'s broad reading. *First*, precedential concerns point that way. We generally must follow a published precedent like *Eason* (whether right or wrong) until the Supreme Court or our en banc court jettisons it. *See Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985). And it is not obvious to me that *Shular* squarely confronted the key issue in this case, let alone rejected the broad definition of "involve" in favor of the narrow one. Nothing in *Shular*'s bottom-line holding—that courts should decide whether a state crime is a "serious drug offense" using a conduct-based approach, not a generic-offense approach—seems to have turned on this subtle difference in the meaning of "involve." 140 S. Ct. at 785. *Shular*'s chosen conduct-based approach makes sense whether that word means "relate to" or "require." Its references to the narrower definition thus do not appear critical to the question presented or the ultimate result.

This distinction also might not have mattered to the outcome in *Kawashima v. Holder*, 565 U.S. 478 (2012). That case concerned a statute that required a court to determine whether a prior crime "involv[ed] fraud or deceit." *See id.* at 485. The Court noted in one sentence that this phrase covered "offenses with elements that necessarily entail fraudulent or deceitful conduct." *Id.* at 483–84. It went on to hold that the specific crimes at issue necessarily entailed deceit even if they did not include deceit as a formal element. *Id.* at 484–85. The Court thus did not need to address whether "involve" could also reach crimes that were merely related to deceit.

Given the ultimate holdings of these cases, I doubt that the Court *itself* would feel bound by *Shular*'s references to the "necessarily entails" or "necessarily requires" test if it addresses this case's question about the meaning of "involving." After all, the Court has repeatedly said that it does not "dissect" every sentence of its opinions as if they were enacted statutes that have passed through both houses of Congress. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *see Borden v. United States*, 141 S. Ct. 1817, 1833 n.9 (2021) (plurality opinion); *Cent. Green Co. v. United States*, 531 U.S. 425, 431 (2001); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). Still, I agree that *Shular*'s statements (even if dicta) cast enough doubt on *Eason*'s reading to allow us to reassess that decision—as the majority opinion explains when discussing our caselaw on the requirement to follow prior precedent. *See Ellmann v. Baker (In re Baker)*, 791 F.3d 677, 682–83 (6th Cir. 2015); *cf. Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013); *Carpenters Loc. Union No. 26 v. U.S. Fid. & Guar. Co.*, 215 F.3d 136, 141–42 (1st Cir. 2000).

*Second*, besides the lack of an unambiguous Supreme Court holding giving the word "involve" a narrow construction, a practical concern favors *Eason*'s broader reading. *Eason* was no outlier. If we depart from that decision, we depart from nearly every other court in the country—at least at the present time. Before *Shular*, a near-unanimous judicial consensus interpreted "involve" broadly to mean "related to" or "connected with." *See Eason*, 919 F.3d at 390–91. These courts thus held that many similar inchoate offenses qualified as "serious drug offenses" even though a defendant could commit them without undertaking any manufacturing or distributing. *See, e.g.*, *United States v. McKenney*, 450 F.3d 39, 42–45 (1st Cir. 2006) (drug conspiracy); *United States v. King*, 325 F.3d 110, 112–15 (2d Cir. 2003) (attempted drug crime); *United States v. Daniels*, 915 F.3d 148, 152–67 (3d Cir. 2019) (attempted drug crime); *United States v. Winbush*, 407 F.3d 703, 705–08 (5th Cir. 2005) (attempted drug crime); *United States v. Williams*, 931 F.3d 570, 575–76 (7th Cir. 2019) (financing drug manufacturing or delivery); *United States v. Coleman*, 700 F.3d 329, 339 (8th Cir. 2012) (attempted drug crime); *United States v. Alexander*, 331 F.3d 116, 131 (D.C. Cir. 2003) (attempted drug crime). (The Fourth Circuit reached a similar result for similar statutory language. *See United States v. James*, 834 F.2d 92, 93 (4th Cir. 1987).)

As the majority opinion rightly notes, other courts have begun to cite *Shular*'s "necessarily require" or "necessarily entail" test when discussing the word "involve" in the statutory definition of "serious drug offense" or similar definitions. *See, e.g.*, *United States v. Sandoval*, 6 F.4th 63, 108–09 (1st Cir. 2021); *United States v. Smith*, 983 F.3d 1213, 1223 (11th Cir. 2020); *United States v. Ruth*, 966 F.3d 642, 647 (7th Cir. 2020). As far as I am aware, however, no circuit court has held that a crime that the court previously found covered (under its old "related to" test) no longer counts (under a new "necessarily entails" test). *Cf. United States v. Prentice*, 956 F.3d 295, 299–300 (5th Cir. 2020); *United States v. Miles*, 2021 WL 3077302, at *2 (N.D. Fla. July 21, 2021). We thus would break significant new ground by relying on *Shular* to depart from *Eason*.

B

In my mind, though, two factors point the other way. *First*, the government has not argued that *Eason*'s "related to" test binds us as a precedential matter. It instead continues to embrace *Shular*'s narrow reading (while suggesting that this reading covers the Kentucky crime at issue in this case). The government's decision to accept the narrow reading may (or may not) be intentional. Recall that, unlike in *Eason*, it advocated for the narrow definition in *Shular*, asserting that "involve" means to "include (something) as a necessary part or result." Brief for the United States at 13, *Shular*, 140 S. Ct. 779 (No. 18-6662), 2019 WL 6324154 (quoting *New Oxford Dictionary of English* 962 (2001)). The government in *Shular* may well have departed from its prior "related to" test because the defendant claimed that this test was unworkable. *See* Brief for Petitioner at 24–29, *Shular*, 140 S. Ct. 779 (No. 18-6662), 2019 WL 4689150. According to the government, the "necessarily entails" test avoids these administrative headaches by adopting a "straightforward inquiry" that courts can easily apply. Transcript of Oral Argument at 46, *Shular*, 140 S. Ct. 779 (No. 18-6662), 2020 WL 354451.

I agree that the narrow definition leads to an easy-to-apply test. But this test is easy to apply precisely because it excludes inchoate crimes like the offenses at issue in this case and *Eason*. Under the "necessarily entails" or "necessarily requires" framework, a court need only ask whether a crime will always include manufacturing, distributing, or possessing with intent to manufacture or distribute in order for a defendant to commit it. If the crime could be completed

without any of those activities occurring, the crime does not "necessarily entail" or "necessarily require" the activities (even if it is related to them). And here, the majority opinion persuasively explains why a defendant could complete the crime of possessing an ingredient with intent to produce methamphetamine without anyone engaging in anything resembling "manufacturing."

I simply do not understand the government's contrary argument that the difference between the two definitions does not matter in this case. Its view that an offense can "necessarily require" certain conduct even if the crime can be accomplished without that conduct conflicts with the ordinary English meaning of those words. It also resurrects the workability concerns that the government seemingly sought to eliminate by abandoning *Eason*'s "related to" test in *Shular*. I have no idea what crimes would (or would not) "necessarily entail" manufacturing under the government's view. The pre-*Shular* caselaw that treated inchoate drug offenses as "serious drug offenses" confirms that this distinction matters. These decisions do not suggest that these inchoate offenses would involve manufacturing or distributing under a narrow definition of "involve." Rather, they treated such unfinished crimes as "serious drug offenses" by adopting the broad "related to" test that the government previously espoused. *See, e.g.*, *Daniels*, 915 F.3d at 155; *Winbush*, 407 F.3d at 707; *King*, 325 F.3d at 113–14. In one of these cases, a defendant even quoted the narrow definition to argue that a state drug conspiracy was not a serious drug offense. *See McKenney*, 450 F.3d at 42–43. The First Circuit did not hold that the "narrow definition" would cover the conspiracy. *Id.* at 43. It instead adopted the broad definition that did cover it. *Id.*

In short, the difference between the definitions is critical. Yet the government does not treat *Shular*'s narrow definition as dicta or *Eason*'s broad definition as binding. I suppose we could find that *Eason* continues to bind us on our own initiative because litigants cannot force us to create bad law through their agreements in the lawsuit. *See Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289 (1917); *Weston v. Wash. Metro. Area Transit Auth.*, 78 F.3d 682, 685 (D.C. Cir. 1996); *Brown v. United States*, 868 F.2d 859, 864 (6th Cir. 1989); *cf. Terry v. United States*, 141 S. Ct. 1858, 1862 (2021). Nevertheless, that neither party treats *Eason*'s broad reading as the binding test undermines any claim that we must continue to follow it after *Shular*.

*Second*, *Shular*'s narrow reading strikes me as the better one. The statutory definition of "serious drug offense" dates to the Career Criminals Amendment Act of 1986. Pub. L. No. 99-570, § 1402(b), 100 Stat. 3207, 3207-39 to 3207-40. Then, as now, "involve" had a range of meanings. Every dictionary that I have reviewed lists a definition like the following: "to include as a necessary circumstance, condition, or consequence; imply; entail[.]" *Random House Dictionary of the English Language* 1005 (2d ed. 1987); *see also Oxford Dictionary of English* 912 (2d ed. 2003); 8 *Oxford English Dictionary* 57 (2d ed. 1989); *Webster's Third New International Dictionary* 1191 (1986); *American Heritage Dictionary of the English Language* 690 (1969); *Webster's New International Dictionary of the English Language* 1307 (2d ed. 1944). This definition might have grown out of the word's original meaning: to "envelop" or "wrap up." *See* 8 *Oxford English Dictionary, supra*, at 57. When "involve" is used in this sense, the subject that precedes the word typically contains or requires the direct object that comes after it. It would apply, for instance, if an employer told a prospective employee that "the job would involve travel." *American Heritage Dictionary of the English Language* 921 (4th ed. 2000). The employee likely would think that the job requires travel (like the position of a traveling salesperson), not that the job relates to travel (like the position of an airport baggage handler).

Other times, "involve" means "implicate." When used to mean "implicate," the word usually conveys that a person has a "close, often entangling, connection with something" that is typically unsavory or criminal. *Webster's New International, supra*, at 1307 (2d ed.). If, for example, a politician discussed "evidence that involved the governor in the scandal," the politician would be describing evidence that connected the governor to the scandal. *American Heritage, supra*, at 921 (4th ed. 2000). When "involve" is used in this sense, the subject that precedes the word ("evidence") typically connects a direct object ("governor") to an indirect object ("scandal").

Some dictionaries also suggest that "involve" can mean "relate closely." *Webster's Third, supra*, at 1191; *Webster's Ninth New Collegiate Dictionary* 637 (1984). *Webster's Third* lists as its lone example for this usage: "the problem is closely *involved* with the management of pastures." *Webster's Third, supra*, at 1191. It thus suggests that the phrasal verb "involved with" conveys this meaning (like the phrasal verb "relate to"). *Cf. McGraw-Hill's Dictionary of*

*American Idioms and Phrasal Verbs* 352, 554 (2005). Another dictionary ties this "relate to" meaning to another definition: "to relate to or affect" as in "the matter *involves* his honor." *Webster's New World Dictionary* 711 (3d college ed. 1988); *cf. Random House*, *supra*, at 1005 ("to affect, as something within the scope of operation").

In sum, "involve" can mean anything from "include," to "implicate," to "relate to." We thus must decide which usage an ordinary person would think best fits the statutory definition at issue here. *See United States v. Hill*, 963 F.3d 528, 532–33 (6th Cir. 2020). To recap, "serious drug offense" covers "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance" (as long as the offense has at least a 10-year maximum sentence). 18 U.S.C. § 924(e)(2)(A)(ii). This text, it seems to me, signals the first meaning—"to include as a necessary circumstance, condition, or consequence[.]" *Random House*, *supra*, at 1005. That is because "involving" connects an intangible subject ("offense") with active objects ("manufacturing, distributing, or possessing with intent to manufacture or distribute"). This construction is typical when "involve" seeks to convey that one thing contains another. Indeed, one dictionary even lists a directly on-point example for this definition: "a bill proposing harsher penalties for crimes involving firearms and drugs." *Oxford Dictionary of English*, *supra*, at 912.

Admittedly, the First Circuit—the only pre-*Shular* circuit to grapple with these differing definitions—thought that "connect closely" or "relate closely" was the better reading. *McKenney*, 450 F.3d at 43 (citations omitted). I do not see why. The full definition with "connect closely" provides: "[t]o connect closely and often incriminatingly; implicate." *American Heritage*, *supra*, at 921 (4th ed. 2000). Yet the statute does not seek to convey that a state offense is incriminatingly connected to the "manufacturing" or "distributing" of drugs—as if this inanimate offense (like a person) could commit the crimes. The statute identifies the conduct that the offense must *contain* (i.e., "include"), not the conduct that the offense must have *participated in* (i.e., "implicate"). As noted, moreover, when "involve" means "implicate" or "connect," an inanimate subject (like "evidence") typically connects one thing (like "governor") with something else (like "scandal"). *See id.* This construction is a poor fit for this statute.

That leaves "relate to." I have found only a few dictionaries, including *Webster's Third* and *Webster's Ninth New Collegiate* (an offshoot), that list this definition for "involve." Yet the Supreme Court has told us to use *Webster's Third* "cautiously" given its "frequent inclusion of doubtful, slipshod meanings[.]" Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 422 & n.21 (2012); *see MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 n.3 (1994). In addition, the statute does not use the phrasal-verb construction ("involved with") that *Webster's Third* associates with this usage. *Webster's Third*, *supra*, at 1191. Although another dictionary ties this "relate to" definition with "affect," *Webster's New World*, *supra*, at 711, the statute also does not suggest that a state offense must have an effect on manufacturing or distributing. The statute instead conveys a meaning closer to this dictionary's example for "include" ("a project *involving* years of work") than its example for "relate to or affect" ("the matter *involves* his honor"). *Id.*

Even if some lingering ambiguity existed, though, other contextual clues point to a narrow reading. For starters, the broad definition comes with a superfluity downside. Congress opted to identify three specific types of covered drug activities in the statutory definition: manufacturing, distributing, and possessing with intent to manufacture or distribute. Yet the third activity serves no purpose under a broad "related to" definition of "involving." I, for example, would think that possessing a *drug* (say, cocaine) with an intent to manufacture another drug (say, crack cocaine) "relates to" manufacturing—in the same way that purchasing a drug *ingredient* relates to manufacturing. *See Eason*, 919 F.3d at 391–92. Similarly, possessing a drug with an intent to distribute it also "relates to" distribution—as the Fourth Circuit essentially held in a related context. *See James*, 834 F.2d at 93. If "involve" means "relate to," Congress had no reason to include this possession activity in the statute. The narrow definition, by contrast, gives each of the three objects independent work to do. *See Clark v. Rameker*, 573 U.S. 122, 130–31 (2014); *see also United States v. Colon*, 268 F.3d 367, 376–77 (6th Cir. 2001).

To be sure, when Congress seeks to ensure wide coverage by using broad language, its statutes will often contain some amount of redundancy. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992); *cf. TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 577–78 (6th Cir.

2010). And we must respect Congress's choice if its unambiguous language shows that it opted for this belt-and-suspenders approach. *See* Scalia & Garner, *supra*, at 176–77.

But Congress does not appear to me to have opted for that approach here. If it sought to broadly cover any state drug crime related to manufacturing or distributing, it could have simply said "relating to." Congress has not been shy about using that phrase. In the same section as the definition of "serious drug offense," it prohibited individuals from traveling interstate to buy a gun "with the intent to engage in conduct which" "violates any State law relating to any controlled substance[.]" 18 U.S.C. § 924(g)(3); *see also id.* § 924(k)(2). It also defined "felony drug offense" (another phrase used to increase sentences, *see*, *e.g.*, 21 U.S.C. § 841(b)(1)(C)) to mean "an offense . . . under any law of . . . a State . . . that prohibits or restricts conduct relating to" various drugs. 21 U.S.C. § 802(44); *see United States v. Spikes*, 158 F.3d 913, 932 (6th Cir. 1998).

Perhaps most tellingly, the very Act that codified the "serious drug offense" definition evinces a clear distinction between "relating to" and "involving." For one thing, this Act elsewhere imposed stiffer sentences for individuals who had prior felony convictions under a "law of a State . . . *relating to* narcotic drugs[.]" Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1002, 100 Stat. 3207, 3207-3 to 3207-4 (emphasis added). (Congress has since amended this provision. *See* 21 U.S.C. § 841(b)(1)(A), (B).) If Congress did not intend different meanings, why would it use "relating to" in some places yet switch to "involving" for the "serious drug offense" definition? *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983).

For another thing, the Act uses "involve" or "involving" elsewhere to mean "include," not "relate to." The unconstitutional "residual clause" in the nearby "violent felony" definition covers a crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another." § 1402(b), 100 Stat. at 3207-40 (codified at 18 U.S.C. § 924(e)(2)(B)(ii)), *declared unconstitutional by Johnson v. United States*, 576 U.S. 591, 606 (2015). Similarly, the Act adopted a staggered sentencing scheme that ties an offense's sentence to the quantity of drugs involved. So, for example, an offense "involving" "1 kilogram or more" of heroin calls for a 10-year minimum sentence. § 1002, 100 Stat. at 3207-2 (codified as amended at 21 U.S.C. § 841(b)(1)(A)). Just as these other uses of the word "involve" require an offense to include (not

be related to) certain dangerous conduct or drug amounts, so too the definition of "serious drug offense" requires a state offense to include (not be related to) manufacturing, distributing, or possessing with the intent to manufacture or distribute.

That said, I readily acknowledge that Congress could have used language requiring an even closer connection between a state drug offense and the manufacture or distribution of drugs. The Act, for example, imposed harsher sentences for an offense that "*is* burglary" or that "*has as an element*" the use of force. § 1402(b), 100 Stat. at 3207-40 (codified at 18 U.S.C. § 924(e)(2)(B)(i)–(ii)) (emphases added). As the First Circuit noted, the verb "involve" covers more conduct than these more precise words. *McKenney*, 450 F.3d at 43. For example, the offense of wearing body armor while distributing drugs might not "be" the offense of drug distribution, but it still could qualify as a serious drug offense because it necessarily entails ("involves") that distribution. *Cf. United States v. Gibbs*, 656 F.3d 180, 187–89 (3d Cir. 2011). And even if a crime does not have drug manufacturing as a "formal element[]," it could still qualify as a serious drug offense if that conduct must occur whenever anybody commits the crime. *Kawashima*, 565 U.S. at 483–84; *cf. Borden*, 141 S. Ct. at 1822 (plurality opinion). But I fail to see why these other phrases help answer whether "involve" should mean "relate to" or "necessarily entail." Just because "involve" has a broader reach than "is" does not make it as expansive as "relate to."

Lastly, even if the reader is still not convinced, remember that we are interpreting a criminal statute. The rule of lenity thus applies when choosing between these differing definitions of the word "involve." *See Jones v. United States*, 529 U.S. 848, 858 (2000); *cf. Shular*, 140 S. Ct. at 787–89 (Kavanaugh, J., concurring). I would think that I have said enough to show that the statute at least remains ambiguous after exhausting all of the traditional tools of interpretation. This potential tie breaker thus points in the direction of the narrow definition too.

\* \* \*

To sum up, I am hesitant to depart from a published precedent like *Eason* and from the current approach in many other courts based on Supreme Court reasoning that the Court may later treat as dicta. At the same time, I do think *Shular* allows us to reexamine *Eason*'s

definition, especially considering that the federal government has not defended that definition here. And, perhaps most notably, the statutory context and structure lead me to conclude that *Shular*'s narrow reading of "involving" best fits the statutory definition of "serious drug offense." For these reasons, along with those in Judge White's majority opinion, I concur.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

ROGERS, Circuit Judge, concurring and dissenting in part. I concur in all but Part IV.A of the majority opinion. The published holding of this court in *United States v. Eason*, 919 F.3d 385 (6th Cir. 2019), flatly precludes the adoption of a "necessarily requires" standard, and incidental language in a Supreme Court opinion resolving a very different issue is not sufficient to overrule our precedent. While such language might be relevant or even persuasive in the absence of binding published precedent of our court, or in arguments for en banc review or certiorari to the Supreme Court, it is not sufficient to overrule our precedent.

We are required to follow the clear holding in *Eason* notwithstanding *Shular v. United States*, 140 S. Ct. 779 (2020). Formally speaking, any language in *Shular* appearing to adopt the "necessarily requires" standard is, at most, dictum rather than holding. *See id*. at 784-86. More importantly, though, a careful reading of the *Shular* opinion does not reflect that the Court even adopted that standard.

First, the issue in *Shular* was whether, as the offender argued, finding a "serious drug offense" required a generic-offense analysis. The *Shular* Court ruled in *favor of the government* on this issue, and certainly would have done the same thing if it had assumed a more generous reading of "involves" than the "necessarily entail" standard. Accordingly, the "necessarily entail" standard was simply not necessary to its affirmance of the court of appeals. Formally speaking, in other words, any statement by the Court that "involves" cannot be broader than "necessarily entail," to the detriment of the government, cannot be a holding in a case where the government prevailed.

Second, a careful reading shows that Justice Ginsburg was not deciding the "necessarily entail" issue, regardless of whether such a decision would have been dictum or holding. The Court used the *Kawashima* case as an "example" to show that the Court did not always require a generic-offense analysis. *See id*. at 783 (citing *Kawashima v. Holder*, 565 U.S. 478 (2012)). In describing the dispute before it, the Court described the Government's view as that "a court

should apply 'the *Kawashima* categorical approach,'" which asks "whether the state offense's elements 'necessarily entail one of the types of *conduct*' identified in § 924(e)(2)(A)(ii)." *Id.* at 784 (emphasis in original).

But the Court went on in the next paragraph to describe the two positions more crisply as follows:

> This methodological dispute is occasioned by an interpretive disagreement over § 924(e)(2)(A)(ii)'s reference to "manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance." Those terms, in the Government's view, describe conduct a court can compare directly against the state crime's elements. Shular sees them instead as offenses whose elements a court must first expound.

*Id.* at 785. This description is the one that immediately precedes the Court's statement that "[t]he Government's reading, we are convinced, correctly interprets the statutory text and context." *Id.* In the following sentence, the Court concluded that § 924(e)(2)(A)(ii) "refers to conduct." *Id.* In other words, the statement that the Government's reading "correctly interprets the statutory text and context" refers to the Court's holding that the statute requires a conduct-focused, rather than a generic-offense, approach. The "correctly interprets" statement thus cannot be read to apply to the "necessarily entail" language without simply disregarding the intervening paragraph that the Court was obviously referring to.

The subsequent paragraphs confirm this. The Court's primary argument was that words like "manufacturing" and "distributing" were unlikely names for generic offenses. This argument says nothing about the meaning of "involves." The Court's second argument was that the word "involving" "suggests that the descriptive terms immediately following the word . . . identify conduct." *Id.* The Court reasoned that in contrast, the use of the word "is" instead of "involving" would have been used to refer to crimes. In making this argument, the Court did say the "[t]he parties agree that 'involve' means 'necessarily require[d],'" *id.*, but this was only to support the idea that the words addressed conduct. It is true that the fact that the parties agreed does not by itself make a statement dictum, but in the context of this case it certainly shows that the language used by the Court was not meant to reject an argument (that "involve" means more than "necessarily requires") when that was not an argument before it.

So what we have is a clear holding in a published opinion of our court that adopts a broad interpretation of "involving" in the statute, and an intervening opinion of the Supreme Court that does not hold, or even decide, or even make an analysis that could be used to support, the contrary. We are bound to follow our precedent, no matter how thoughtful the arguments for coming to a different conclusion are, in the absence of en banc review or an intervening Supreme Court decision adopting a different rule.

I do not address subparts 2-4 of Part IV.A of the majority's opinion, which proceed to apply the "necessarily entail" test. The majority appears to accept that affirmance would be required on this issue if the *Eason* test instead were applied.